# IN THE SUPREME COURT OF TENNESSEE
# AT KNOXVILLE
## September 2, 2010 Session

## EVELYN NYE v. BAYER CROPSCIENCE, INC., ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Hamilton County**
**No. 06C760      W. Neil Thomas, III, Judge**

---

**No. E2008-01596-SC-R11-CV - Filed June 7, 2011**

---

In this products liability case, a widow sought compensation for the death of her husband from mesothelioma allegedly caused by exposure to asbestos at his workplace. She sued the company that sold products containing asbestos to her husband's employer. She based her claim on strict liability and alleged that the seller sold defective products and failed to warn her husband of the products' health risks. The jury found that the seller was at fault, but that her husband's employer was the sole cause of his injury and awarded her nothing. The widow appealed. The Court of Appeals reversed and remanded for a new trial based on erroneous jury instructions that more probably than not affected the judgment of the jury. On review, we hold that the seller was subject to suit in strict liability, pursuant to Tennessee Code Annotated section 29-28-106(b) (2000), because none of the products' manufacturers were subject to service of process. Further, we hold that the trial court erred by instructing the jury that the seller could not be held liable for failure to warn if the jury found that the consumer, identified as the employer, was already aware of any danger in connection with the use of the products or if the employer had been given adequate warnings. This jury instruction was erroneous for two reasons. First, it applied the learned intermediary doctrine, which the courts of this state have limited to medical products and pharmaceuticals. Second, the jury instruction misidentified the consumer as the employer, when the consumer who was required to be warned was the employee, Mr. Nye. Because the error more probably than not affected the judgment of the jury, the judgment of the trial court is reversed and the cause is remanded for a new trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed; Case Remanded**

1

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., and GARY R. WADE, J., joined. JANICE M. HOLDER, J., filed a separate opinion, concurring in part and dissenting in part, in which WILLIAM C. KOCH, JR., J. joined.

Hugh B. Bright, Jr., Michael J. King, and Latisha J. Stubblefield, Knoxville, Tennessee, for the appellant, National Service Industries, Inc. f/k/a/ North Brothers, Inc.

Jimmy F. Rodgers, Jr., Chattanooga, Tennessee, and John E. ("Rett") Guerry, III, and Benjamin D. Cunningham, Mt. Pleasant, South Carolina, for the appellee, Evelyn Nye.

**OPINION**

**Background**

Hugh Todd Nye was diagnosed with malignant pleural mesothelioma in September of 2005.[1] He died from this disease on August 1, 2006. Mr. Nye's mesothelioma was allegedly caused by exposure to asbestos during the time he worked for DuPont at its Chattanooga, Tennessee, facility from 1948 to 1985. As an operator on DuPont's continuous polymerization line, and during the course of his employment, Mr. Nye was often exposed to dust arising from the removal of asbestos insulation from pipes in the areas where he worked.

In May of 2006, Mr. Nye and his wife sued a number of defendants, including National Service Industries, Inc., a successor in interest to North Brothers, Inc. ("North Brothers"), seeking compensatory damages for injuries allegedly caused by Mr. Nye's exposure to asbestos-containing products at the DuPont facility. The Nyes asserted claims sounding in negligence, strict liability, and breach of warranty against numerous named manufacturers, sellers, and distributors of the asbestos-containing products.

In February of 2007, Mrs. Nye amended the complaint to allege Mr. Nye's death from mesothelioma on August 1, 2006. In addition to seeking damages for his death, she asserted

---

[1] Mesothelioma is a relatively rare cancer of the thin membranes lining the chest and abdomen. It is frequently observed among asbestos workers. Asbestos has been classified as a known human carcinogen by the U.S. Department of Health and Human Services, the Environmental Protection Agency, and the International Agency for Research on Cancer. Agency for Toxic Substances and Disease Registry, U.S. Dep't of Health & Human Servs., Toxicological Profile for Asbestos (2001), available at http://www.atsdr.cdc.gov/toxprofiles/tp61-p.pdf.

that North Brothers[2] sold asbestos-containing products to DuPont that had been manufactured by Owens Corning Fiberglas Corporation ("Owens Corning"), Pittsburgh Corning Corporation ("Pittsburgh Corning"), Raybestos-Manhattan, Inc. ("Raybestos"), and Johns Manville Corporation ("Johns Manville"). In additional amended complaints, Mrs. Nye alleged that these manufacturers had been judicially declared insolvent and were not amenable to service of process.

North Brothers filed a Tennessee Rule of Civil Procedure 56 motion for summary judgment. First, relying on Tennessee Code Annotated section 29-28-106(b),[3] North Brothers asserted that, as a non-manufacturing seller, it did not have a duty to warn with regard to the products it sold. Second, it asserted that Mr. Nye's employer, DuPont, was a "sophisticated purchaser,"[4] and, as such, knew about the danger of the asbestos-containing products. North Brothers' failure to warn, therefore, was not the proximate cause of Mr. Nye's injuries. Next, North Brothers asserted that Mrs. Nye's strict liability claims failed as a matter of law because the manufacturers of the products that North Brothers sold to DuPont had not been judicially declared insolvent, as required by Tennessee Code Annotated section 29-28-106(b). Finally, North Brothers argued that Mrs. Nye's claims were barred by the

---

[2] Mrs. Nye also sued and made similar allegations as to Breeding Insulation Company, Inc. An order of settlement and compromise was later entered as to Breeding Insulation Company, Inc.

[3] Tennessee Code Annotated section 29-28-106(b) provides as follows:

> (b) No "product liability action," as defined in § 29-28-102(6), when based on the doctrine of strict liability in tort, shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user or consumer unless the seller is also the manufacturer of the product or the manufacturer of the part thereof claimed to be defective, or unless the manufacturer of the product or part in question shall not be subject to service of process in the state of Tennessee or service cannot be secured by the long-arm statutes of Tennessee or unless such manufacturer has been judicially declared insolvent.

[4] In its motion for summary judgment, North Brothers used the term "sophisticated user." In its brief to this Court, North Brothers noted that in its trial court pleadings, it used the term "sophisticated user" as synonymous with "learned intermediary" or "sophisticated purchaser." The sophisticated user doctrine focuses on the ultimate user or consumer of the product, whereas the learned intermediary or sophisticated purchaser doctrine focuses on the knowledgeable intermediary who intercedes between the supplier or manufacturer and the ultimate user. See 63A Am. Jur. 2d Products Liability § 1091 (2010). For clarity, we refer to the sophisticated purchaser doctrine in light of North Brothers' statement that it intended to assert that DuPont was a learned intermediary or sophisticated purchaser rather than a sophisticated user. The sophisticated user doctrine is not at issue in this appeal.

four-year statute of repose under Tennessee Code Annotated section 28-3-202 (2000) and that her breach of warranty claim was barred by the statute of limitations under Tennessee Code Annotated section 47-2-725 (2001).

The trial court granted summary judgment to North Brothers on the breach of warranty claims based on the statute of limitations. The trial court granted a partial summary judgment to North Brothers based on the statute of repose for any sales occurring before June 30, 1969. The trial court determined there were disputed genuine issues of material fact as to the other grounds, and denied summary judgment. The trial court did not rule on whether a claim in strict liability could be asserted against North Brothers pursuant to Tennessee Code Annotated section 29-28-106(b).

Thereafter, both parties by motion[5] requested the trial court to decide the issue of whether North Brothers was subject to a strict liability suit based on Tennessee Code Annotated section 29-28-106(b) as a result of the pending Chapter 11 bankruptcies of Owens Corning, Pittsburgh Corning, Raybestos, and Johns Manville. The trial court ruled that the manufacturers were not amenable to service of process within the meaning of Tennessee Code Annotated section 29-28-106(b), and therefore, North Brothers was subject to suit as a non-manufacturing seller.

At the time of trial, all the named defendants had been dismissed except North Brothers, and the strict liability claims for sale of defective products and failure to warn were the only surviving claims. The trial court's jury charge included the following instructions:

> A manufacturer or a seller cannot be held liable for failure to warn if you find that the consumer, DuPont, was already aware of any danger in connection with the use of asbestos-containing products, or if you find that adequate warnings were given by manufacturers or sellers to DuPont.
>
> . . . .
>
> In addition, if you find that DuPont failed to provide a safe workplace for Hugh Todd Nye and that this failure was the sole cause of damage to him, then you have found DuPont was

---

[5] North Brothers filed a motion for reconsideration of its summary judgment motion requesting the trial court to address the question of whether North Brothers was subject to a strict liability suit, and Mrs. Nye filed motions in limine requesting the trial court to declare that these manufacturers were not amenable to service of process.

4

the sole cause of his injury, and you may not consider the fault of North Brothers or any other company supplying asbestos-containing materials to DuPont.

The jury found North Brothers was at fault, but that DuPont was the sole cause of Mrs. Nye's damages and awarded her nothing. The trial court denied Mrs. Nye's motion for new trial, and she appealed. The Court of Appeals held that North Brothers could be held strictly liable as a non-manufacturing seller because the manufacturers whose products North Brothers sold were not amenable to service of process due to their bankruptcy proceedings. The Court of Appeals further ruled that the trial court committed harmful error in its instructions to the jury and reversed the jury's verdict and remanded for a new trial.

We granted North Brothers' application for permission to appeal and address two issues: 1) whether North Brothers, as a non-manufacturing seller, is subject to suit in strict liability pursuant to Tennessee Code Annotated section 29-28-106(b) and 2) whether the trial court committed harmful error in its instructions to the jury.

## Analysis

### North Brothers' Liability as a Seller

We begin our analysis of whether North Brothers, as a non-manufacturing seller, is subject to suit in strict liability pursuant to Tennessee Code Annotated section 29-28-106(b), with a brief recitation of the facts and a general discussion of the basis for the strict liability claims in this case.

Mr. Nye began working for DuPont at its Chattanooga plant in 1948 and, except for a brief period of military service, he worked there continuously until he retired in 1985. During this period, Mr. Nye worked on the plant's continuous polymerization line ("CP line"), a section of the plant involved in DuPont's production of yarn. As part of his job duties, Mr. Nye was required to conduct routine inspections of equipment located along the CP line. Often, when he was conducting these inspections, maintenance crews were in the same areas cutting and removing asbestos-containing insulation from pipes. Evidence was presented that this was an anticipated use of the insulation. In addition to inspecting equipment, Mr. Nye's job duties required him to sweep the floor and pick up insulation debris left after the maintenance crews had completed their work. Mr. Nye was frequently exposed to visible dust arising from the removal of the asbestos-containing insulation by work crews and from his own clean-up work. North Brothers sold asbestos-containing insulation products used in the CP line to DuPont. These products included products manufactured by Owens Corning, Pittsburgh Corning, Raybestos, and Johns Manville. There

is no proof that either DuPont or North Brothers warned Mr. Nye of the health risks associated with exposure to the asbestos-containing products. North Brothers did not prepare any written warning for DuPont or any other customers regarding the health risks associated with the asbestos-containing products it sold, did not include any kind of warning to accompany those products describing such dangers to ultimate users of the products like Mr. Nye, and did not inquire as to whether DuPont was warning its employees of the products' dangers. Both DuPont and North Brothers had been aware of the health risks of asbestos since the 1960s. Expert evidence was presented that Mr. Nye's exposure to the asbestos-containing products sold by North Brothers was a contributing cause of his death from mesothelioma.

Mrs. Nye's suit named numerous defendant manufacturers and sellers, including North Brothers, and asserted negligence, strict liability, and breach of warranty claims against these defendants. By the time of trial, North Brothers was the sole remaining defendant, and only the claims in strict liability, based on the sale of allegedly defective products and failure to warn, were presented to the jury.

A commercial seller, such as North Brothers, may be liable in strict liability for physical harm caused to a consumer by a defective product. Restatement (Second) of Torts § 402A (1965).[6] Further, a product liability action[7] may be brought against a manufacturer

---

[6] Restatement (Second) of Torts section 402A provides as follows:

> Special Liability of Seller of Product for Physical Harm to User or Consumer
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

[7] Tennessee Code Annotated section 29-28-102(6) (2000) defines "product liability action" as

> all actions brought for on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design,

or seller on strict liability grounds, with no proof of negligence, if the product causing injury to person or property "is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a) (2000); accord Owens v. Truckstops of Am., 915 S.W.2d 420, 431 (Tenn. 1996). Mrs. Nye alleges that the asbestos-containing products sold by North Brothers were "unsafe for normal or anticipatable handling and consumption," pursuant to Tennessee Code Annotated section 29-28-102(2), at the time of their manufacture, sale, and delivery and at the time of Mr. Nye's exposure. Mrs. Nye contends that the asbestos-containing products manufactured by Owens Corning, Pittsburgh Corning, Raybestos, and Johns Manville, and sold by North Brothers, possessed latent defects at the time of their manufacture, sale, and delivery and at the time of Mr. Nye's exposure.

The other theory on which Mrs. Nye bases her strict liability claim is failure to warn. We noted in Flax v. DaimlerChrysler Corp., 272 S.W.3d 521, 541 (Tenn. 2008) that "Tennessee courts have long held that a manufacturer may be held strictly liable for failing to warn consumers of the dangers of a particular product at the time of sale" and, citing Tennessee Code Annotated section 29-28-102(6), that "[t]he General Assembly has also acknowledged that a failure to warn claim is a valid basis for a product liability action." Mrs. Nye argues that the defendants failed to warn Mr. Nye that the asbestos-containing products were harmful to his health, despite the fact that each defendant knew that the asbestos-containing products were dangerous and would be used without inspection for defects.

North Brothers contends that, as a seller, it cannot be held strictly liable. North Brothers relies on Tennessee Code Annotated section 29-28-106(b) and asserts that although the four manufacturers whose products it sold have sought protection under Chapter 11 of the United States Bankruptcy Code, this fact alone does not prove their insolvency. Further, North Brothers asserts none of the manufacturers have been judicially declared insolvent and all are subject to service of process in Tennessee. Accordingly, North Brothers argues, none of the statutory prerequisites to suit in strict liability have been satisfied.

As to the matter of insolvency, a debtor need not be insolvent to qualify for protection under Chapter 11 of the Bankruptcy Code. In re Mount Carbon Metro. Dist., 242 B.R. 18,

<div style="margin-left: 2em">

formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever.

</div>

32 (Bankr. D. Colo. 1999); In re Johns-Manville Corp., 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984). Because there is no proof that any of the four manufacturers has been judicially declared insolvent, the insolvency statutory prerequisite has not been met.

We next consider whether Owens Corning, Pittsburgh Corning, Raybestos, or Johns Manville were "not subject to service of process" so as to trigger the provisions of section 29-28-106(b). Our interpretation of this statute is a question of law and as such, is reviewed de novo with no presumption of correctness. Chattanooga-Hamilton Cnty. Hosp. Auth. v. Bradley Cnty., 249 S.W.3d 361, 365 (Tenn. 2008).

The primary rule governing our construction of any statute is to ascertain and give effect to the legislature's intent. Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 309 (Tenn. 2008). To that end, we begin by examining the language of the statute. Curtis v. G.E. Capital Modular Space, 155 S.W.3d 877, 881 (Tenn. 2005). In our examination of statutory language, we must presume that the legislature intended that each word be given full effect. Lanier v. Rains, 229 S.W.3d 656, 661 (Tenn. 2007). When the language of a statute is ambiguous in that it is subject to varied interpretations producing contrary results, Walker, 249 S.W.3d at 309, we construe the statute's meaning by examining "the broader statutory scheme, the history of the legislation, or other sources." State v. Sherman, 266 S.W.3d 395, 401 (Tenn. 2008). However, when the import of a statute is unambiguous, we discern legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000); see also In re Adoption of A.M.H., 215 S.W.3d 793, 808 (Tenn. 2007) ("Where the statutory language is not ambiguous . . . the plain and ordinary meaning of the statute must be given effect."). We "presume that the legislature says in a statute what it means and means in a statute what it says there." Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 803 (Tenn. 2000) (quoting BellSouth Telecomms., Inc. v. Greer, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

The statutory phrase "not subject to service of process" is unambiguous; therefore, we look to the plain and ordinary meaning of the statute. The phrase "subject to" is defined as "liable to receive; exposed (with to)." Webster's New World Dictionary of the English Language 1452 (1966). The word "service" is defined as "[t]he formal delivery of a writ, summons, or other legal process" and is "[a]lso termed *service of process*." Black's Law Dictionary 1372 (7th ed. 1999) (emphasis in original). Correspondingly, "process" is defined as "[a] summons or writ, esp. to appear or respond in court <service of process>." Id. at 1222. "Service of process," therefore, necessarily presumes the existence of an underlying lawsuit for which a summons or writ was issued. The plain and ordinary meaning of the phrase "not subject to service of process" means not exposed to or liable to receive a

8

summons to appear in court on a underlying lawsuit. See Stafford v. Briggs, 444 U.S. 527, 553 n.5 (1980) ("[A]s a general rule, service of process is the means by which a court obtains personal jurisdiction over a defendant."); Griffin v. Roberts, No. M2002-01898-COA-R3-CV, 2003 WL 21805299, at *2 (Tenn. Ct. App. Aug. 7, 2003). With this definition in mind, we look to see whether any of the manufacturers were subject to being served with a summons to appear in a pending lawsuit.

All of the manufacturers filed a petition under Chapter 11 of the federal Bankruptcy Code, codified at 11 U.S.C. §§ 101-1532 (2006 & Supp. 2010).[8] Upon the filing of the Chapter 11 petition, the automatic stay provision applied, 11 U.S.C. § 362(a), and each manufacturer was allowed to maintain its business operations while restructuring its debt obligations pursuant to a submitted plan of reorganization. See 11 U.S.C. §§ 1101-1174. The automatic stay provision, in pertinent part, provides that a petition operates as a stay of

> (1) *the commencement* or continuation, *including the issuance or employment of process, of a judicial*, administrative, or other *action or proceeding against the debtor* that was or could have been commenced before the commencement of the case under this title, *or to recover a claim against the debtor* that arose before the commencement of the case under this title.

11 U.S.C. § 362(a) (2006).

With narrowly defined exceptions, section 362 stays any action against the debtor or property belonging to the debtor or the bankruptcy estate. In re Winpar Hospitality Chattanooga, LLC, 401 B.R. 289, 291 (Bankr. E.D. Tenn. 2009). The automatic stay, which "is one of the fundamental debtor protections provided by the bankruptcy laws," Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1197 (6th Cir. 1983), serves "'to provide the debtor a 'breathing spell' from collection efforts and to shield individual creditors from the effects of a 'race to the courthouse,' thereby promoting the equal treatment of creditors.'" In re Webb Mtn, LLC, 414 B.R. 308, 335 (Bankr. E.D. Tenn. 2009) (quoting In re Printup, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001)). "It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." Lynch, 710 F.2d at 1197. Consistent with its goal of insulating the debtor to provide financial stability, "[t]he automatic stay is designed to protect the debtor from

---

[8] Owens Corning filed its bankruptcy petition on October 5, 2000; Pittsburgh Corning on April 16, 2000; Johns Manville on August 26, 1982; and Raybestos on March 10, 1989.

judgments and the consequences thereof, such as the attachment of a judgment lien to the debtor's property." Kliefoth v. Fields, 828 S.W.2d 714, 716 (Mo. Ct. App. 1992).

The stay applies to the commencement of an action to recover a claim against a debtor that "arose *before* the commencement of the [bankruptcy] case." 11 U.S.C. § 362(a)(1) (2006) (emphasis added). Accordingly, we must determine when Mrs. Nye's claims arose relative to the filing of the four manufacturers' bankruptcy petitions.

A "claim" is defined by the Bankruptcy Code to include a "*right to payment*, whether or not such right is reduced to judgment . . . ." 11 U.S.C. § 101(5) (2006) (emphasis added). The phrase "right to payment" is not defined in the Bankruptcy Code, and courts have devised various tests to determine when right to payment arises with respect to a claim in bankruptcy. The bankruptcy court has exclusive jurisdiction to determine the nature of the claims and the extent of the automatic stay. Cf. Cathey v. Johns-Manville Sales Corp., 711 F.2d 60, 63 (6th Cir. 1983) (holding that the bankruptcy court has exclusive authority to grant relief from stay).

Owens Corning filed its bankruptcy petition in the District of Delaware on October 5, 2000. See In re Owens Corning, 419 F.3d 195, 202 (3d Cir. 2005). Pittsburgh Corning filed its bankruptcy petition in the Western District of Pennsylvania on April 16, 2000. See In re Pittsburgh Corning Corp., 417 B.R. 289, 295 (Bankr. W.D. Pa. 2006). When Mrs. Nye filed her complaint in 2006, the applicable test in the Third Circuit, which includes Delaware and Pennsylvania, was the test set forth in Avellino & Bienes v. M. Frenville Co., 744 F.2d 332 (3d Cir. 1984). This test provided that a claim arises when the cause of action accrues under state law. In "creeping disease" cases, such as asbestos-related injuries, Tennessee law provides that the cause of action accrues with diagnosis of the disease. See Wyatt v. A-Best Co., 910 S.W.2d 851, 856-57 (Tenn. 1995). Therefore, under the Frenville test, Mrs. Nye's claim arose in 2005 *after* Owens Corning and Pittsburgh Corning filed for bankruptcy and therefore these manufacturers would not have been subject to the automatic stay. However, the Frenville test was overturned by the Third Circuit in Jeld-Wen, Inc. v. Van Brunt (In re Grossman's, Inc.), 607 F.3d 114 (3d Cir. 2010), which held that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." Id. at 125. The Third Circuit's decision to overrule Frenville was made in the face of what the court deemed to be well-reasoned "universal disapproval" of that decision, based on its apparent conflict with the Bankruptcy Code's expansive treatment of the term "claim." Id. at 121.[9] The plaintiff

---

[9] Frenville has been "universally rejected," In re Andrews, 239 F.3d 708, 710, n.7 (5th Cir. 2001), and has been described by one court as "one of the most criticized and least followed precedents decided under the current Bankruptcy Code." In re Firearms Imp. and Exp. Corp., 131 B.R. 1009, 1015

10

in <u>Grossman's</u>, who contracted mesothelioma allegedly due to exposure to an asbestos-containing product, asserted a claim against the product's seller. Her exposure to the asbestos-containing product occurred in 1977, years before the seller filed its Chapter 11 petition. The plaintiff's manifestation of symptoms, diagnosis of mesothelioma, and lawsuit occurred after the seller's plan of reorganization had been confirmed by the bankruptcy court. Under this newly adopted test, the plaintiff's claim in <u>Grossman's</u> was considered to have arisen before the petition and therefore was subject to the automatic stay.

Mrs. Nye's claim was pending and thus in the "pipeline" when the <u>Grossman's</u> test was adopted. The <u>Grossman's</u> test has been applied retroactively to pending cases. <u>Wright v. Owens Corning</u>, No. 09-1567, 2011WL 1085673 (W.D. Pa. March 21, 2011)[10]; <u>see also</u> <u>In re Rodriguez</u>, 629 F.3d 136, 139 (3d Cir. 2010). Therefore, the pre-petition relationship test adopted in <u>Grossman's</u> is determinative as to when Mrs. Nye's claims arose against Owens Corning and Pittsburgh Corning. Applying the pre-petition relationship test to Mrs. Nye's claim, we conclude that her claim arose when her husband was exposed to the asbestos-containing products. Therefore, these manufacturers were not subject to service of

---

(Bankr. S.D. Fla. 1991). In <u>Grossman's</u>, the Third Circuit noted that a liberal treatment of the term "claim" is dictated by Congressional intent, as evidenced by House Reports stating that the definition of "claim" at section 101(5) is the "'broadest possible definition [and it] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in the bankruptcy court.'" <u>Grossman's</u>, 607 F.3d at 121 (quoting H.R.Rep. No. 95-595, at 309 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6266); <u>see also</u> Lawrence R. Ahern, III, & Darlene T. Marsh, <u>Environmental Obligations in Bankruptcy</u>, § 3:24 (2011).

[10] In <u>Wright</u>, the plaintiff filed a putative class action by suing Owens Corning on November 24, 2009. The defendant argued that under the <u>Frenville</u> test, the claim was discharged in Owens Corning's bankruptcy. The federal district court noted that the Third Circuit had overturned <u>Frenville</u> and established in <u>Grossman's</u> a new test to determine when a claim exists for purposes of a bankruptcy proceeding. Even though the plaintiff's claim against Owens Corning was filed when the <u>Frenville</u> test was applicable law, the district court applied the <u>Grossman's</u> test retroactively, relying on the conclusion of the United States Supreme Court in <u>Harper v. Va. Dept. of Transp.</u>, 509 U.S. 86 (1993), that "'a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law,' . . . and extended 'to other litigants whose cases were not final at the time of the [first] decision.'" <u>Wright</u>, 2011 WL 1085673, at *9 (quoting <u>Harper</u>, 509 U.S. at 96). Even without the authority of <u>Wright</u>, we would have applied the <u>Grossman's</u> test retroactively for two primary reasons. First, the <u>Frenville</u> test was not sound law; its reasoning was flawed, and it was universally rejected by other courts. We see no reason to perpetuate bad law. While we have a strong commitment to stare decisis, "mindless obedience to the precept can confound the truth." <u>Dupuis v. Hand</u>, 814 S.W.2d 340, 346 (Tenn. 1991). The <u>Grossman's</u> test has a sound foundation and is a proper application of bankruptcy principles. Second, the rule of retroactivity stated by the U.S. Supreme Court in <u>Harper</u> clearly supports the application of <u>Grossman's</u> rather than <u>Frenville</u> in the instant matter.

process in Tennessee because Mrs. Nye's claims against these manufacturers arose before the filing of their bankruptcy cases.

We now shift our analysis to the other two manufacturers – Raybestos and Johns Manville. The plans of reorganization for Raybestos and Johns Manville had been confirmed by the Bankruptcy Court before Mrs. Nye filed her complaint.[11] As a general matter, confirmation of the plan of reorganization ends the automatic stay, re-vests the property of the estate in the debtor, and, pursuant to 11 U.S.C. § 1141(d),[12] simultaneously discharges the debtor. In re Draggoo Elec. Co., 57 B.R. 916, 919 (Bankr. N.D. Ind. 1986). Once this occurs, the automatic stay provision is no longer effective and service of process against the debtor is not prohibited by section 362. Nevertheless, these manufacturers were still shielded from service of process in Tennessee courts under the terms of specific injunctions set forth in their confirmed plans of reorganization.

Johns Manville was the first of the two manufacturers to have its plan confirmed. Johns Manville's bankruptcy was precipitated, not by that company's inability to meet its present debts, but by its anticipation of future asbestos-related tort causes of action by parties who had been exposed to Johns Manville's asbestos-containing products before it filed bankruptcy but who would not manifest symptoms of asbestos-related disease during the pendency of the bankruptcy proceedings.[13] Kane v. Johns-Manville Corp., 843 F.2d 636, 639 (2d Cir. 1988). Confirmation of a plan of reorganization generally discharges the debtor from pre-confirmation debts, 11 U.S.C. § 1141(d)(1), but discharge of a claim may be precluded on due process grounds if the claimant has not been given adequate notice that he or she has a claim in bankruptcy. See Grossman's, 607 F.3d at 125-26. This would apply

---

[11] Johns Manville's plan was confirmed in December of 1986; and Raybestos' plan was confirmed in August of 2000.

[12] Section 1141 under Chapter 11 of the Bankruptcy Code provides in pertinent part that "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation. . . ." 11 U.S.C. § 1141(d)(1)(A) (2006 & Supp. 2010).

[13] In the years following Johns Manville's bankruptcy, there was a steady increase in the number of actual and potential claimants. As of January 31, 1996, approximately 285,600 claims had been filed with estimates of the total projected number of claims that would eventually be filed as high as 600,000 and with estimates for total claims liability in excess of 22 billion dollars. Frank J. Macchiarola, The Manville Personal Injury Settlement Trust: Lessons for the Future, 17 Cardozo L. Rev. 583, 598 (1996). A Rand Corporation report published last year reflects that as of September 30, 2009, 817,264 claims had been filed. Lloyd Dixon, Geoffrey McGovern & Amy Coombe, Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts, 128 n. 6 (2010). http://www.rand.org/publications.html.

to claimants whose injuries were not manifested as of the time of confirmation. Anticipating this due process problem, Johns Manville addressed it in its reorganization plan. Kane, 843 F.2d at 640. In an effort to satisfy the claims of all present and future asbestos exposure victims and allow Johns Manville to maximize its value as it continued its business operations, the confirmed plan of reorganization provided for the creation of a trust against which all such claimants could proceed to satisfy their claims through either settlement, mediation, arbitration, or tort litigation. Id. To ensure Johns Manville's protection from future massive personal injury lawsuits that could prevent its successful reorganization, the bankruptcy court issued a "channeling injunction" as a pre-condition to confirmation of the plan. Id. This channeling injunction provided that present and future asbestos claimants were prohibited from suing Johns Manville and could only proceed against the asbestos claims trust. Id.

Congress, inspired by the strategy employed by the architects of Johns Manville's reorganization, enacted section 524(g) of the Bankruptcy Code as part of the Bankruptcy Reform Act of 1994 to address the asbestos claims problem on a national basis. See Grossman's, 607 F.3d at 126. Section 524(g) provides that if the following pre-conditions have been met, the bankruptcy court may issue an injunction to supplement the injunctive effect of discharge:

> 1) a trust is established which assumes the present and future asbestos personal injury and property damage liabilities of the debtor;
> 2) the trust is funded in whole or part by securities of the debtor and obligations of the debtor to make future payments, including dividends;
> 3) the trust will own, or by exercise of rights granted under the plan will be entitled to own, a majority of the voting stock of the debtor, parent or subsidiary, if specified contingencies occur;
> 4) the trust will pay the present and future asbestos claims against the debtor;
> 5) the present and future claims will all be valued and paid in substantially the same manner;
> 6) the plan is approved by at least 75 percent of all asbestos claimants who vote; and
> 7) a futures representative is appointed.

11 U.S.C. § 524(g)(2)(B) (2006). If issued, the channeling injunction would enjoin entities from taking legal action for the purposes of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any asbestos-related claim or demand that,

under the confirmed plan of reorganization, is to be paid in whole or in part by the asbestos personal injury trust established as a pre-condition to the injunction.

The confirmed Chapter 11 plans of reorganization of Johns Manville and Raybestos contained channeling injunctions. Therefore, suit by Mrs. Nye against these manufacturers was prohibited and for that reason, neither of them was subject to service of process in the courts of this state at the time the Nye complaint was filed.[14]

In summary, we conclude that Mrs. Nye has presented proof establishing the first element under Tennessee Code Annotated section 29-28-106(b), that Owens Corning, Pittsburgh Corning, Raybestos, and Johns Manville are not subject to service of process in the state of Tennessee. Therefore, Mrs. Nye can pursue a strict liability action against North Brothers as to injuries allegedly sustained as the result of her husband's exposure to products of those manufacturers that North Brothers sold to Dupont.

## Jury Instructions

### *Learned Intermediary Instruction*

Next, we review a portion of the trial court's instructions to the jury. Whether a jury instruction is erroneous is a question of law and is therefore subject to de novo review with no presumption of correctness. Solomon v. First Am. Bank of Nashville, 774 S.W.2d 935,

---

[14] Tennessee Code Annotated section 29-28-106(b) was enacted in 1978 – eight years before the creation of the first channeling trust by Johns Manville. The legislature could not have had channeling trusts in mind when the statute was enacted, thus, the statute does not contemplate how a claim against a seller should be handled when a channeling trust is involved. North Brothers argues that allowing Mrs. Nye's strict liability suit under the statute could result in double recovery given the availability of funds in the manufacturers' trusts. However, Mrs. Nye will not be fully compensated under any of the trusts. North Brothers attached documentation as an exhibit to a response in opposition to a motion in limine indicating that Mrs. Nye collected $26,250 from the Johns Manville trust in 2006 and that Mrs. Nye has filed a claim against the Owens Corning trust. The Rand Corporation reports a current payout rate of 7.5% for the scheduled value of a claim allowed under the Johns Manville trust and a 10% payout rate for the scheduled value of a claim allowed under the Owens Corning trust, which will result in a payout of just $21,500 on a Owens Corning mesothelioma claim. Lloyd Dixon, Geoffrey McGovern & Amy Coombe, Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts, 128, 146 (2010). http://www.rand.org/publications.html. Similarly, while there is no evidence in the record as to whether Mrs. Nye has filed a claim against the Raybestos trust, Claims Processing Facility, Inc., reports a mere 2% payout rate for an established claim accepted under the Raybestos trust, resulting in an actual dollar amount of only $2,500 for a mesothelioma claim. Claims Processing Facility, Inc., http://www.cpf-inc.com/raytech-trust/raytech-trust-faqs/ (last visited April 20, 2001). In any event, to the extent that implementation of the statute results in any double recovery, that is a matter for legislative action and not properly addressed by the judiciary.

940 (Tenn. Ct. App. 1989). The legitimacy of a jury's verdict is dependent on the accuracy of the trial court's instructions, which are the sole source of the legal principles required for the jury's deliberations. Therefore, a trial court is under a duty to impart "substantially accurate instructions concerning the law applicable to the matters at issue." Hensley v. CSX Transp., Inc., 310 S.W.3d 824, 833 (Tenn. Ct. App. 2009) (quoting Bara v. Clarksville Mem'l Health Sys., Inc., 104 S.W.3d 1, 3-4 (Tenn. Ct. App. 2002)). When considering whether a trial court committed prejudicial error in a jury instruction, it is our duty to review the charge in its entirety and consider it as a whole, and the instruction will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 446 (Tenn. 1992). The judgment of a trial court will not be set aside based on an erroneous jury instruction unless it appears that the erroneous instruction more probably than not affected the judgment of the jury. Tenn. R. App. P. 36(b); Gorman v. Earhart, 876 S.W.2d 832, 836 (Tenn. 1994).

The trial court's instructions to the jury at issue are as follows:

> A manufacturer or a seller cannot be held liable for failure to warn if you find that the consumer, DuPont, was already aware of any danger in connection with the use of asbestos-containing products, or if you find that adequate warnings were given by manufacturers or sellers to DuPont.
>
> . . .
>
> In addition, if you find that DuPont failed to provide a safe workplace for Hugh Todd Nye and that this failure was the sole cause of damage to him, then you have found DuPont was the sole cause of his injury, and you may not consider the fault of North Brothers or any other company supplying asbestos-containing materials to DuPont.

The jury's spokesperson sought clarification of the charges as follows:

> Well, if we find that the product was defective and because of it being defective and everyone knew about it being defective and it was still manufactured and sold as a defective product, that's where we have trouble with this paragraph as far as the manufacturer or the seller cannot be liable for failure to warn if they find the consumer, DuPont, was already aware of

15

any danger. So, you know, there's enough evidence that showed that DuPont knew of all the danger but so did everyone else.

I guess where we are kind of stuck at the point that we are stuck at is that I think we all feel the product was defective because of the danger of the product itself. So because of that and because of this paragraph here as far as the manufacturer and seller cannot be held liable for failure to warn, they kind of to us kind of contradicts each other.

Subsequently, the trial court sent a note to the jury, stating as follows:

Let me preface this note by reminding you to consider all of the charge and not single out some and ignore the others. Let me say that all parts of the charge are equally important.

In determining whether DuPont was the sole cause of Mr. Nye's injury you should consider what DuPont knew compared with the knowledge of all others.

In determining whether there was a failure to warn you should consider what DuPont knew compared with the knowledge of all others.

Specifically, Mrs. Nye contends this instruction is erroneous because it is based on the "learned intermediary" doctrine[15] which has not been adopted in Tennessee for products liability cases, except cases involving pharmaceuticals and medical products. Mrs. Nye argues that this instruction allows the jury to absolve North Brothers of liability merely upon

---

[15] The learned intermediary doctrine is sometimes referred to as "the sophisticated purchaser doctrine."

Although there may be shades of difference between ['the learned intermediary rule' and 'the sophisticated purchaser rule'] as they are applied by courts, the fundamental tenet is that a manufacturer should be allowed to rely upon certain knowledgeable individuals to whom it sells a product to convey to the ultimate users warnings regarding any dangers associated with the product.

In re TMJ Implants Prods. Liab. Litig., 872 F. Supp. 1019, 1029 (D. Minn. 1995).

a finding that DuPont knew about the risks of the asbestos-containing products purchased from North Brothers.

This issue requires us to review the propriety of the learned intermediary doctrine. This doctrine, which allows a seller in a failure to warn case to rely on an intermediary to convey warnings about a dangerous product, derives from section 388 of the Restatement (Second) of Torts (1965).[16] Comment *n* to section 388 provides that when a seller sells a product to an intermediary, the seller may rely on the intermediary to provide warnings to the user of the product if such reliance is reasonable under the circumstances. Although section 388 addresses a supplier's duty to warn under the law of negligence, courts also apply its principles to the duty to warn in strict liability. See, e.g., Ackermann v. Wyeth Pharm., 526 F.3d 203, 208 n.5 (5th Cir. 2008); Smith v. Walter C. Best, Inc., 927 F.2d 736, 741-42 (3d Cir. 1990); Bradco Oil & Gas Co. v. Youngstown Sheet & Tube Co., 532 F.2d 501, 504 (5th Cir. 1976); Ebel v. Eli Lilly & Co., 536 F.Supp.2d 767, 773 (S.D. Tex. 2008); Higgins v. E.I. DuPont de Nemours & Co., 671 F. Supp. 1055, 1059-60 (D. Md. 1987).

Traditionally, the learned intermediary doctrine has been applied to warnings related to prescription drugs. See Victor E. Schwartz & Christopher E. Appel, Effective Communication of Warnings in the Workplace: Avoiding Injuries in Working with Industrial Materials, 73 Mo. L. Rev. 1, 22 (2008). The doctrine constitutes a defense by pharmaceutical manufacturers in cases where a plaintiff has suffered injury from a medication prescribed by a doctor. Physicians, who play a pivotal role in the distribution of prescription drugs, are the intermediaries relied on by manufacturers to give warnings to patients. A majority of jurisdictions, including Tennessee, recognize that a pharmaceutical manufacturer can

---

[16] Restatement (Second) of Torts § 388 provides as follows:

**Chattel Known to be Dangerous for Intended Use.**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

discharge its duty to warn by providing the physician with adequate warnings of the drug's risks. Pittman v. Upjohn Co., 890 S.W.2d 425, 429 (Tenn. 1994). In Tennessee, the learned intermediary doctrine is applicable in failure to warn suits where a physician is the intermediary between a defendant pharmaceutical or other medical product manufacturer and an injured patient. See id.; King v. Danek Med., Inc., 37 S.W.3d 429, 452-53 (Tenn. Ct. App. 2000); Harden v. Danek Med., Inc., 985 S.W.2d 449, 451 (Tenn. Ct. App. 1998).

North Brothers, relying on Ford Motor Co. v. Wagoner, 192 S.W.2d 840 (Tenn. 1946) and Whitehead v. Dycho Co., 775 S.W.2d 593 (Tenn. 1989), argues that the learned intermediary doctrine applies not just to pharmaceutical or other medical product cases, but to other product liability cases. North Brothers' reliance, however, is misplaced because this Court has not expanded the application of the learned intermediary doctrine beyond the pharmaceutical or medical arena.

In Wagoner, a particular model of one of Ford's automobiles was marketed with a defective hood latch such that when the car was subjected to a severe jolt, the hood would spring up and obscure the driver's vision. 192 S.W.2d at 841. When Ford discovered the defect, it distributed an auxiliary catch to all of its dealers with instructions to install the catch to remedy the defect. Id. The car in question was sold by one agency to another and then by the second agency to one of its salesmen. Id. The catches were received by the second agency while the salesman owned the car, and he was informed about and offered one of the precautionary catches. Id. at 841-42. He regarded the catch as unnecessary and rejected it. Id. at 842. Subsequently, the salesman sold the car to another party, whose guest, the plaintiff, was injured while driving the car when the hood sprang up and caused an accident. Id. Ford argued that the salesman's independent and intervening act in failing to make use of the catch and in neglecting to advise his vendee about the catch broke the causal chain and was the proximate cause of the accident, not Ford's negligence. Id. The determinative issue, as noted by this Court, was whether the evidence established that the salesman, as an intermediary vendor, was put on such notice of the defect and the remedy "as to bring into play the rule which fastens the charge of *conscious* intervening negligence upon an intermediate vendor and relieves the manufacturer of liability." Id. at 842 (emphasis in original). This Court stated that under this rule the continuing liability of a manufacturer such as Ford to successive purchasers is "subject to be[ing] destroyed . . . by the intervening act of an agency which is (1) independent, (2) efficient, (3) conscious and (4) not reasonably to have been anticipated." Id. at 844. This Court did not adopt the learned intermediary doctrine in Wagoner, but rather applied the intervening cause doctrine. These are two separate and distinct doctrines; the application of the former does not indicate an adoption of the latter.

18

The learned intermediary doctrine was likewise not adopted in Whitehead, 775 S.W.2d 593. In Whitehead, Magnavox purchased naphtha, a combustible solvent used for cleaning purposes, from two distributors. Naptha was distributed to Magnavox by transport truck or in 55-gallon drums. Id. The trucks and drums displayed warnings that naptha was either flammable or combustible, and Magnavox was aware that naptha was highly flammable and should not be exposed to heat or sparks due to the possibility of explosion or fire. Id. Magnavox transferred naptha from the drums that carried the distributors' warning labels to smaller, pump-type containers without warnings and provided these containers to its employees for use in cleaning glue from their work aprons. Id. The plaintiff, an employee of Magnavox, had not been advised of naptha's dangerous propensities. Id. at 596. Unaware of naptha's dangerous propensities, the plaintiff took a can of it home to clean her apron as she was allowed to do by Magnavox. Id. When she attempted to use the naptha in her washing machine, an explosion resulted, and she was severely injured. Id. The plaintiff sued the distributers of naptha in strict liability and alleged that the product was defective, unreasonably dangerous, and sold without sufficient warnings of its dangerous qualities. Id. at 594.

The trial court granted summary judgment to the distributors, in part upon the ground that Magnavox was a learned intermediary and therefore the distributors could reasonably rely on Magnavox to warn its employees about naptha's danger and instruct them in its use. Id. at 596. The court of appeals reversed the grant of summary judgment, noting that "[t]he majority view and the view that this Court deems to be the better one is that the manufacturer's duty to warn extends to the employee-user as well as the employer-purchaser." Whitehead v. Dycho Co., No. 6935, 1987 WL 27044 at *8 (Tenn. Ct. App. Dec. 11, 1987) (citations omitted). Neither rejecting nor adopting the learned intermediary doctrine in the employer-employee context, the intermediate court determined that the plaintiff was entitled to a jury trial as to the adequacy of warnings given and whether the distributors' duty to give warnings extended to her. We reversed the intermediate court in Whitehead and affirmed the trial court's grant of summary judgment. Whitehead, 775 S.W.2d at 598. We noted that one of the reasons relied on by the trial court for its grant of summary judgment was a finding that *"Magnavox was a learned intermediary and the defendants could reasonably rely upon Magnavox to warn its employees of the dangers of naptha and to instruct them in its use."* Id. (emphasis added). In affirming the trial court's grant of summary judgment, we carefully noted that the reason for our decision was different from the reasons underlying the trial court's opinion. Id. at 598. Our ruling was based on a finding that "the causal connection was broken by the independent intervening acts of Magnavox in failing to place warnings on containers for use by its employees and in failing to warn Plaintiff of the dangerous propensities of naptha." Id. at 599. We concluded that the plaintiff had failed to present evidence that she would not have sustained her injuries had the distributors provided proper warnings, noting that the plaintiff never saw the drums in which

19

the distributors transported naptha to Magnavox and had there been inadequate warnings on the drums, that would not have been the proximate cause of the accident. Id. We further observed that Magnavox "was the only party in a position to issue an effective warning to the Plaintiff," stating that the distributors "had no reasonable access to the Plaintiff." Id. at 600. While Whitehead digressed into a discussion of the reasonableness of the distributors' reliance on Magnavox to convey warnings, it is clear that as in Wagoner, the holding was based on the intervening cause doctrine, not the learned intermediary doctrine. This Court was presented with an opportunity to affirm the trial court by specifically applying the learned intermediary doctrine, but did not do so.

Tennessee courts have not previously applied the learned intermediary doctrine to product liability actions arising in the workplace, and we do not find it appropriate to do so now.[17] The rationale for the doctrine limits its application to the unique circumstances of the medical arena where a physician seeks to find the optimal treatment for a particular patient, as indicated in the following discussion of that rationale as it pertains to prescription drugs:

> We cannot quarrel with the general proposition that where *prescription* drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This special standard for prescription drugs is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The

---

[17] In support of its argument that this state has adopted the learned intermediary doctrine with respect to non-medical cases, North Brothers cites a Sixth Circuit case, Jacobs v. E.I. DuPont De Nemours & Co., 67 F.3d 1219, 1244-45 (6th Cir. 1995) and three Tennessee federal district court cases, Davis v. Komatsu Am. Indus. Corp., 46 F.Supp.2d 745, 754 (W.D. Tenn. 1999); Byrd v. Brush Wellman, Inc., 753 F. Supp. 1403 (E.D. Tenn. 1990); and Travelers Indem. Co. v. Indus. Paper & Packaging Corp., No.3:02-CV-491, 2006 WL 2050686 (E.D. Tenn. July 19, 2006). To the extent that these cases conclude that this Court has adopted the learned intermediary doctrine outside of the medical arena, they are incorrect. Our refusal to adopt the learned intermediary doctrine in Whitehead was properly recognized by the United States District Court for the District of Minnesota in TMJ Implants Products Liability Litigation, 872 F.Supp. 1019, 1031 (D. Minn. 1995) ("The Supreme Court of Tennessee specifically declined to either accept or reject the . . . learned intermediary doctrine[ ] in Whitehead.").

20

choice he makes is an informed one, and individualized medical judgment bottomed on a knowledge of both patient and palliative.

Dooley v. Everett, 805 S.W.2d 380, 386 (Tenn. Ct. App. 1990) (quoting Stone v. Smith, Kline & French Labs., 731 F.2d 1575, 1579-80 (11th Cir. 1984)) (emphasis in original) (citations omitted). In Hall v. Ashland Oil Co., 625 F.Supp. 1515 (D. Conn. 1986), the district court of Connecticut set forth various distinctions between an industrial employer utilizing a hazardous substance, such as benzene, and a doctor prescribing medication:

> First, unlike the doctor, whose primary purpose in selecting a drug is to promote the well-being of the ultimate user, the industrial purchaser's basic interest in selecting a chemical solvent is the overall utility of that solvent in its manufacturing processes. While avoiding health risks to its employees is a consideration that goes into choosing one chemical over another, it is not the employer's sole concern, or even its primary focus. Second, there is no guarantee that the ordinary industrial employer is an expert on health risks. A chemical company may be in a position to act as an expert concerning the industrial uses and disadvantages of a chemical and yet not have the capacity to serve adequately as a learned intermediary concerning medical risks associated with the chemical. Third, the marketing system for industrial chemicals differs from that of prescription drugs – benzene and other chemicals are not subject to the strict limitations on availability that apply to drugs. . . . Fourth, the relationship of doctor and patient is a one-on-one relationship where the doctor assesses the individual needs of each patient. . . . Even an employer who is aware of direct effects of the chemical may be unaware of more subtle or diffuse risks. Finally, the prescription drug cases, in relieving manufacturers of the duty to warn drug users, shift that duty on to a party who can be held legally liable to the patient for failing to fulfill it. This powerful incentive is limited by the exclusive remedy provisions of the workman's compensation statutes.

Id. at 1519-20.

Comment *n* of section 388 of the Restatement acknowledges that the duty to warn of hazards associated with the use of a product increases with the amount of danger involved. It

is established that asbestos is an extremely dangerous substance and that unprotected exposure to respirable asbestos fibers over a period of time may well result in death. Given the highly hazardous nature of asbestos, the dire consequences to the unwarned consumer, and the important distinctions between the use of asbestos by an employer in industry and the use of pharmaceuticals and medical devices by a doctor in treating his or her patient, we find good reason not to extend the learned intermediary doctrine to products liability cases where an employee claims damages for injuries from a product containing asbestos or some other highly toxic substance purchased by the employer and used by the employee during the course of his or her employment.

*Causation*

Finally, North Brothers argues that even if the learned intermediary doctrine is not extended to this case, the trial court's instruction was still correct because it accurately reflects the law of causation in Tennessee and properly allowed the jury to find that DuPont was the sole cause in fact of Mr. Nye's injuries.

Causation, an essential element of any products liability action, refers to both "proximate cause" and "cause in fact." This Court has noted the distinction between these two terms as follows:

> Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient."

Snyder v. LTG Lufttechnische GmbH, 955 S.W.2d 252, 256 n. 6 (Tenn. 1997) (citations omitted). To enable a jury to determine whether an employer's actions may have been the cause in fact of the plaintiff's injury, evidence showing what happened to the product leading up to the plaintiff's injury must be permitted. Otherwise, the manufacturer or seller will be effectively precluded from the defense that the product was not defective when it left the

manufacturer's or seller's control. <u>Snyder</u>, 955 S.W.2d at 256. As we also noted in <u>Snyder</u>, if the rule were different, "the defendant[] would be restricted from presenting evidence that the plaintiff's employer altered, changed, or improperly maintained the [product]." <u>Id.</u> n. 7.

It was proper for the jury to consider the actions of DuPont in determining whether DuPont was the cause in fact of Mr. Nye's injuries. However, it does not follow that it was also proper to instruct the jury that if DuPont was aware of any dangers in connection with the use of the products it purchased from North Brothers, North Brothers could not be held liable for failure to warn. In support of its argument that DuPont's knowledge of the products' dangers absolves North Brothers of liability, North Brothers quotes the following language from <u>Harden</u>, relied on by the trial court in formulating the instruction at issue:

> [A] manufacturer will be absolved of liability for failure to warn for lack of *causation* where the consumer was already aware of the danger, because the failure to warn cannot be the proximate cause of the user's injury if the user had actual knowledge of the hazards in question.

<u>Harden</u>, 985 S.W.2d at 451(quoting 63A Am.Jur.2d <u>Products Liability</u>, § 1162 (1984)) (emphasis added). In relying on <u>Harden</u>, North Brothers mistakenly, as did the trial court in its jury instruction, identifies DuPont, rather than Mr. Nye, as the consumer in the instant matter. The <u>Harden</u> court indicated that, for purposes of the learned intermediary doctrine, the physician stands in the place that the consumer would otherwise occupy as the party to whom a duty to warn is owed:

> Under [the learned intermediary doctrine], physicians are the "consumers" who must be warned. Thus, it is generally held that the learned intermediary doctrine may shield a manufacturer from liability when the physician was independently aware of the risks involved.

<u>Id.</u> We construe the court's language applying the term "consumer" to the intermediary physician to mean that the physician, in effect, *replaces* the party to whom the duty to warn is owed. This is not to say that the physician *is* the consumer in the strict sense. The patient remains the consumer or user. It is still the patient, not the doctor, who is ingesting the pharmaceutical or into whose body the medical device is implanted.

The learned intermediary doctrine does not apply in this case, and Mr. Nye, not DuPont, was the consumer. This conclusion is supported by the language of the Tennessee Products Liability Act, which distinguishes the employee/consumer from the employer by

23

defining "[e]mployer" to mean "any person exercising legal supervisory control or guidance of users or consumers of products." Tenn. Code Ann. § 29-28-102 (3). It is also supported by comment *l* to § 402A of the Restatement (Second) of Torts (1965) stating that

> 'User' includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purposes of doing work upon it, as in the case of *an employee of the ultimate buyer* who is making repairs upon the automobile which he has purchased.

(Emphasis added).

DuPont's knowledge of the danger of asbestos did not make DuPont the sole cause in fact of Mr. Nye's injuries. Rather, based on their knowledge of the dangers of the asbestos-containing products, it may be shown that *both* DuPont *and* North Brothers were the causes in fact of Mr. Nye's injuries as a result of their failure to warn him of the products' dangers. North Brothers disputes this and contends that it cannot be the cause in fact of Mr Nye's injury for two reasons. First, North Brothers argues that if DuPont had not purchased the asbestos-containing products North Brothers supplied DuPont, "DuPont would have bought them from another source." Second, North Brothers notes that Mr. Nye admitted in deposition testimony that he never saw the boxes that were used by North Brothers to ship its products to DuPont. North Brothers argues that Mr. Nye would never have seen any warnings on the boxes even if they had been there. Both arguments are without merit. As to the first argument, DuPont *did* purchase asbestos-containing products from North Brothers, and it is irrelevant what DuPont would have done had it not purchased the products from North Brothers. As to the second argument, North Brothers could have availed itself of alternative means of effectively warning Mr. Nye and other DuPont employees of the dangers of the products it sold DuPont and was not limited to placing a warning on boxes that were not visible to such employees. For example, warnings might have been printed directly on the products or, if that was not feasible, North Brothers could have provided employees warning pamphlets or conducted joint information sessions with DuPont to alert employees to the dangers associated with the products. See Whitehead v. St. Joe Lead Co., 729 F.2d 238, 247 (3d Cir. 1984).

In summary, we hold that the learned intermediary doctrine is not applicable under the circumstances of this case. The trial court's jury instruction based on that doctrine, absolving North Brothers of liability for Mr. Nye's injury upon a finding that DuPont was already aware of the dangers of the asbestos-containing products or that adequate warnings were given to DuPont of such dangers, was erroneous and was not otherwise proper under the law

of causation. It is further apparent that this error in the instruction more probably than not affected the judgment of the jury. Accordingly, we find that the jury instruction was reversible error.

## Conclusion

For the reasons stated, we hold that, pursuant to Tennessee Code Annotated section 29-28-106(b), North Brothers is subject to suit on strict liability grounds for injuries allegedly sustained by Mr. Nye as a result of his exposure to the asbestos-containing products that North Brothers supplied to DuPont. We further hold that the trial court committed harmful error in adopting the learned intermediary doctrine in its instruction to the jury. Accordingly, we affirm the judgment of the Court of Appeals. The judgment of the trial court is reversed, and the case is remanded for a new trial. Costs are assessed to the appellant, National Service Industries, Inc., f/k/a/ North Brothers, Inc., and its surety, for which execution may issue if necessary.


_____
SHARON G. LEE, JUSTICE