IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 11, 2013 Session

**AUBREY E. GIVENS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE
ESTATE OF JESSICA E. GIVENS, DECEASED**
**v.**
**HARDIE V. SORRELS, III, M.D.**

**An Appeal from the Circuit Court for Wilson County**
**No. 2011-CV-169      John D. Wootten, Judge**

**No. M2012-01712-COA-R3-CV - Filed August 21, 2013**

This is an appeal from a jury verdict. The plaintiff filed this lawsuit against the defendant physician, claiming that his medical malpractice caused the death of the decedent. The trial court conducted an eight-day jury trial on the plaintiff's claims. The jury ultimately rendered a verdict in favor of the defendant physician. The plaintiff now appeals, asking this Court to reverse the trial court's judgment on the verdict on the basis of numerous alleged errors. After careful review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Aubrey T. Givens and John Clark, Nashville, Tennessee, for the Plaintiff/Appellant, Aubrey E. Givens, Individually and as Administrator of the Estate of Jessica E. Givens, Deceased.

J. Eric Miles and Michael F. Jameson, Nashville, Tennessee, for the Defendant/Appellee, Hardie V. Sorrels, III, M.D.

# MEMORANDUM OPINION[1]

This lawsuit arises out of the death of Jessica E. Givens ("Mrs. Givens"). The decedent, Mrs. Givens, had a complicated medical history. Defendant/Appellee Hardie V. Sorrels, III, M.D. ("Dr. Sorrels"), a board-certified internal medicine physician, was Mrs. Givens' primary care physician from 1990 until her death in 2007 at age 64.

In September 2006, Mrs. Givens presented to the emergency room of the University Medical Center in Lebanon, Tennessee, with shortness of breath. It was later determined that she had suffered a myocardial infarction or, in layman's terms, a heart attack. Because of the complexity of Mrs. Givens' condition,[2] the University Medical Center transferred her to the Vanderbilt University Medical Center ("Vanderbilt") in Nashville, Tennessee. The Vanderbilt physician placed two stints in Mrs. Givens' heart and discharged her on September 12, 2006.

Mrs. Givens did not stay out of the hospital for long. Only a few days later, on September 15, 2006, Mrs. Givens returned to the University Medical Center, where she was diagnosed with another myocardial infarction and atrial fibrillation. The University Medical Center again transferred Mrs. Givens to Vanderbilt. The doctors at Vanderbilt treated her for myocardial infarction, congestive heart failure, cardiogenic shock, atrial fibrillation, acute renal (kidney) failure, respiratory failure, and two bouts of *C. difficile*[3] colitis. While at Vanderbilt, Mrs. Givens suffered a significant embolic stroke. She remained hospitalized for approximately six weeks; during this time she was placed on a ventilator and required a tracheostomy, a feeding tube, and a catheter. Vanderbilt discharged Mrs. Givens on October 27, 2006.

---

[1]**Rule 10. Memorandum Opinion**

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Tenn. Ct. App. R. 10.

[2]Mrs. Givens had insulin-dependent diabetes, which caused a variety of problems, such as neuropathy (nerve damage to the feet) and retinopathy (nerve damage to the eyes). She also had a history of fatigue, back pain, and difficulty walking. At the ensuing trial, one expert testified, "people with diabetes have strange symptoms when they have a heart attack."

[3]*C. difficile* is an abbreviation for *Clostridium difficile*, a bacteria found in the colon, ordinarily caused by taking excessive antibiotics.

From then on, Mrs. Givens was in and out of the hospital repeatedly. From the date she was discharged from Vanderbilt on October 27, 2006, until January 15, 2007, Mrs. Givens was hospitalized four times. During these hospitalizations, she was treated for a variety of medical issues, including pulmonary edema, congestive heart failure, renal (kidney) insufficiency, and atrial fibrillation. By this time, Givens was bedridden. She procured a hospital bed for her home, could not get out of bed without assistance, and had to be transported by ambulance to see her physician. By the end of 2006, Mrs. Givens had a catheter, feeding tube, and respirator; she required round-the-clock care from either a family member or a nurse.

On January 15, 2007, Mrs. Givens again presented to the University Medical Center emergency room. This time, she had severe pain and confusion as well as other medical issues. The emergency room physician, Michael Crane, M.D. ("Dr. Crane"), ordered a urinalysis and a urine culture for Mrs. Givens.

Dr. Sorrels was notified that Mrs. Givens had been admitted to the University Medical Center emergency room, so he went to the hospital to see her. After checking on Mrs. Givens, Dr. Sorrels took over her care. Dr. Sorrels reviewed the results of the urinalysis ordered by Dr. Crane and diagnosed Mrs. Givens with a urinary tract infection. He prescribed her two antibiotics and discharged her to go home. At the time Dr. Sorrels discharged Mrs. Givens, the results of the urine culture were not yet available, so he told Mrs. Givens' daughter, Rachel Givens ("Rachel"), to call his office the following week to check on the results of the urine culture.

On January 17, 2007, the results of the urine culture became available. The parties disputed at trial when those results were sent to Dr. Sorrels. In any event, Dr. Sorrels did not know on January 17, 2007 that the urine culture test results were available. The test results were sent to emergency room physician Dr. Crane, who had ordered the test when Mrs. Givens was admitted to the emergency room.

On January 18, 2007, a home health nurse assigned to Mrs. Givens recognized that Mrs. Givens' condition was not improving as expected, but was instead deteriorating. As a result, either the home health nurse or daughter Rachel contacted Dr. Sorrels' office on two occasions that day to ascertain the results of the urine culture test. On both occasions, the caller was advised that Dr. Sorrels' office did not yet have the results of Mrs. Givens' urine culture.

Mrs. Givens' condition continued to worsen. On the morning of January 22, 2007, Rachel called Dr. Sorrels' office. She asked about the urine culture test results and was told that Dr. Sorrels' office did not yet have them. Rachel left a message for Dr. Sorrels that indicated

that Mrs. Givens had reduced urinary output and other related symptoms. Dr. Sorrels was given Rachel's message immediately and responded by instructing a member of his staff to call Rachel and tell her to take Mrs. Givens to the emergency room. A note from Dr. Sorrels' office indicates that, after receiving this instruction, Mrs. Givens refused to go to the hospital, against Dr. Sorrels' advice.

Later that afternoon, Rachel called Dr. Sorrels and spoke to him. During that telephone conversation, Dr. Sorrels saw that the report from Mrs. Givens' urine culture test had been faxed to his office earlier that morning and was attached to Mrs. Givens' medical file. The report stated that the urine culture performed in the emergency room visit showed that Mrs. Givens was suffering from a form of *E. coli*[4] that was resistant to the antibiotics Dr. Sorrels had prescribed for her. Dr. Sorrels indicated that Mrs. Givens needed additional blood work taken; a home health nurse took the blood work from Mrs. Givens that afternoon. Dr. Sorrels prescribed a different antibiotic for Mrs. Givens and ordered that she be taken directly to the hospital emergency room. Mrs. Givens arrived at the University Medical Center that evening.

The next day, on January 23, 2007, Mrs. Givens' condition deteriorated still more. Dr. Sorrels examined her and consulted with other physicians regarding her condition. Mrs. Givens developed acute respiratory distress; she was intubated and transferred to the hospital's intensive care unit. In the ICU, it was determined that Mrs. Givens was suffering from either cardiogenic shock (low blood pressure caused by a heart failure) or septic shock (low blood pressure caused by severe infection). Further testing revealed that Mrs. Givens had suffered yet another heart attack.

The next day, on January 24, 2007, Mrs. Givens was "LifeFlighted"[5] to Vanderbilt. By that time, she was suffering from cardiogenic shock, myocardial infarction, and respiratory distress. Upon her arrival at Vanderbilt, Mrs. Givens was admitted to the hospital's coronary care unit. Some blood cultures taken after her arrival at Vanderbilt were negative for any *E. coli* infection. Other testing done several days later on January 27 showed that Mrs. Givens suffered a heart attack leading to cardiogenic shock, not septic shock. While at Vanderbilt, Mrs. Givens was given sedating medications that put her in a medically induced coma. On January 28 or 29, 2007, even though Mrs. Givens had been intubated and was breathing via a ventilator, she received another tracheostomy to further help her breathing. Soon after that, hospital personnel noticed some neurological abnormalities. They later

---

[4]*E. coli* is an abbreviation used for *Escherichia coli*, a bacteria found in the colon.

[5]Vanderbilt LifeFlight provides emergency medical transportation by helicopter to Vanderbilt in the Nashville area.

determined that, while in the medically induced coma, Mrs. Givens had suffered a severe stroke that affected her brain stem.

Mrs. Givens never completely came out of the medically induced coma and she never recovered from the stroke. The medical team at Vanderbilt suggested to Mrs. Givens' family that they consider palliative care for her. The family declined and requested extensive life support measures. Consequently, Mrs. Givens remained hospitalized for another month at Select Specialty Hospital. After Mrs. Givens was finally discharged from that facility, her family cared for her at home. She died at home on August 28, 2007, at age 64.

On April 5, 2011,[6] the instant wrongful death lawsuit was filed against Dr. Sorrels by Mrs. Givens' husband, Aubrey E. Givens ("the Plaintiff"), in his individual capacity and also as the administrator of Mrs. Givens' estate.[7] The Plaintiff alleged in his complaint that Dr. Sorrels committed medical malpractice by failing to timely and properly interpret, report, and communicate the results of the January 15, 2007 urine culture that showed that Mrs. Givens was suffering from an aggressive and resistant form of *E. coli* bacteria. He asserted that Dr. Sorrels' care of Mrs. Givens fell below the applicable standard of care and caused her death. In his answer to the complaint, Dr. Sorrels denied that he breached the applicable standard of care. He denied that Mrs. Givens' death was caused by misdiagnosed *E. coli* bacteria, and asserted that she died from causes related to her heart problems and other maladies. Discovery ensued.

On April 4, 2012, the jury trial on the Plaintiff's claims commenced. Due to scheduling conflicts, the trial took place on eight nonconsecutive days — April 4, 5, 10, 11, 12, 13, 17, and 18. The Plaintiff's case-in-chief consisted of the testimony of several witnesses, including the expert testimony of Richard Fishbein. M.D. and Glenn Goodhart, M.D. (by video). The Plaintiff and Mrs. Givens' daughter Rachel testified as well. Dr. Sorrels' defense included his own testimony plus the expert testimony of Hohn G. Thompson, Jr., M.D., Asghar H. Shaikh (medical technologist), Juli Garner Horton, M.D., and Benny A. Gardner, M.D.

---

[6]This lawsuit was originally filed under docket number 15238, but that case was voluntarily dismissed. The complaint from which the instant appeal arises was filed within one year after the voluntary dismissal pursuant to the savings statute, Tennessee Code Annotated § 28-1-105. Most of the parties' discovery was completed while the first case was pending so, for the sake of efficiency, the trial court allowed all discovery taken in case number 15238 to apply in the instant case. It also made all orders from case number 15238 applicable to this case.

[7] Mrs. Givens' daughter Rachel was a named plaintiff in the first lawsuit, but the trial court in that lawsuit dismissed her as an improper party plaintiff. The instant re-filed lawsuit again named Rachel as a plaintiff, but the trial court below enforced the prior order dismissing Rachel as a plaintiff.

Throughout the trial, the trial court ruled on numerous evidentiary matters, and also accepted offers of proof outside the presence of the jury. After the parties completed their presentation of the proof, the trial court gave jury instructions and the jury retired to deliberate.

On April 18, 2012, after one hour of deliberation, the jury returned a defense verdict in favor of Dr. Sorrels. The jury found that the Plaintiff had not "proven by a preponderance of the evidence that [Dr. Sorrels] was negligent by failing to comply with the recognized standard of acceptable professional practice for his profession and specialty in this community or a similar community providing care and treatment to Jessica E. Givens." On May 4, 2012, the trial court entered an order approving the jury's verdict. On July 20, 2012, the trial court entered two orders, the first denying the Plaintiff's motion for a new trial and the second awarding Dr. Sorrels $27,489.34 in discretionary costs. The Plaintiff now appeals.

## STANDARD OF REVIEW

On appeal, the Plaintiff challenges the jury verdict in favor of Dr. Sorrels on a variety of grounds, as detailed below. The applicable standard for appellate review of a jury verdict is set out in Tennessee Rule of Appellate Procedure 13(d), which provides: "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Elaborating on the "material evidence" standard of review:

> To determine if there is material evidence to support the jury verdict, we "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence."

***Barkes v. River Park Hosp.***, 328 S.W.3d 829, 833 (Tenn. 2010) (quoting ***Whaley v. Perkins***, 197 S.W.3d 665, 671 (Tenn. 2006) (quoting ***Barnes v. Goodyear Tire & Rubber Co.***, 48 S.W.3d 698, 704-05 (Tenn. 2000))). Stated another way:

> When reviewing an appeal from a jury trial, we will not set aside the jury's findings of fact unless there is no material evidence to support them. ***Goodale v. Langenberg***, 243 S.W.3d 575, 583 (Tenn. Ct. App. 2007); Tenn. R. App. P. 13(d). This Court will not re-weigh the evidence, but will take the strongest view possible of the evidence in favor of the prevailing party, discarding evidence to the contrary and allowing all reasonable inferences to uphold the jury's verdict. ***Id.*** A jury verdict will be set aside only if there is no material evidence to support it. ***Id.***

***Watson v. Payne***, 359 S.W.3d 166, 168 (Tenn. Ct. App. 2011). Thus, in applying the material evidence standard of review in this appeal, we give "full faith and credit to all of the evidence that tends to support" the verdict and disregard the evidence that is inconsistent with it. ***Poole v. Kroger Co.***, 604 S.W.2d 52, 54-55 (Tenn. 1980).

In this appeal, the Plaintiff challenges the trial court's *voir dire* procedures, the admission or exclusion of evidence, the sequestration of witnesses during trial, and the award of discretionary costs. The decisions on all of these issues are left to the sound discretion of the trial judge and are reviewed for an abuse of that discretion. A trial court abuses its discretion when it "applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." ***Williams v. Baptist Mem'l Hosp.***, 193 S.W.3d 545, 551 (Tenn. 2006) (quoting ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999) (quotation and citation omitted)). In applying the abuse of discretion standard, we do not substitute our judgment for that of the trial court; the "trial court's ruling 'will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made.'" ***Discover Bank v. Morgan***, 363 S.W.3d 479, 487 (Tenn. 2012) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting ***State v. Scott***, 33 S.W.3d 746, 752 (Tenn. 2000))).

The propriety of the trial court's jury instructions is a question of law; as such, it is reviewed *de novo*, with no presumption of the correctness of the trial court's decision. ***Nye v. Bayer Cropscience, Inc.***, 347 S.W.3d 686, 699 (Tenn. 2011). Jury instructions must "reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses." ***Pomeroy v. Ill. Cent. R.R. Co.***, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *3 (Tenn. Ct. App. May 19, 2005). They need not be "perfect in every detail," they need only be correct and valid as a whole. *Id.* We will not reverse the judgment based on the jury instructions unless the instructions, as a whole, mislead the jury by failing to fairly define the legal issues involved. *Nye*, 347 S.W.3d at 699.

We must also note the harmless error doctrine, embodied in Rule 36(b) of the Tennessee Rules of Appellate Procedure. Under Rule 36(b), even if the trial court commits an error, the appellate court may not set aside the judgment "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Therefore, in appellate review of a judgment on a jury verdict, the trial court's error will not result in reversal of the judgment unless the error "more probably than not prejudiced the jury in its verdict and thereby unfairly tainted the decision-making process." ***In re Estate of Smallman***, 398 S.W.3d 134, 152-52 (Tenn. 2013).

**ANALYSIS**

We have carefully reviewed the substantial record in this case, including the voluminous technical record, trial transcript, and nearly 100 exhibits. As is dictated by our standard of review, set out above, we have viewed the evidence in the light most favorable to the verdict, discarding the evidence that detracts from it. After doing so, we must conclude that the jury's verdict is supported by substantial and material evidence, and that the errors allegedly committed by the trial court did not "involv[e] a substantial right [that] more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We will address the issues raised by the Plaintiff in the order they are raised in his appellate brief.

The Plaintiff first argues that the trial court erred in excluding a potential female juror based solely on the disclosure in her jury questionnaire that she works for State Volunteer Mutual Insurance Company (known as "SVMIC"), a medical malpractice insurance carrier. The trial court excluded this juror after Dr. Sorrels' counsel suggested to the court that she be excluded based on her place of employment listed on the questionnaire. The Plaintiff argues that disqualifying the juror upon the suggestion of defense counsel violated the Plaintiff's constitutional rights by, in effect, giving Dr. Sorrels an extra strike without accounting for it. The Plaintiff contends that the trial court's disqualification of the juror without proper *voir dire* is an error that warrants a new trial.

Dr. Sorrels argues, and we agree, that the Plaintiff did not raise this issue to the trial court at the time the juror was excluded, so the Plaintiff cannot now complain about the disqualification of the juror.[8] More importantly, the Plaintiff does not contend on appeal that this alleged error affected the outcome of the case. It is undisputed that the case was ultimately tried before a panel of competent, impartial jurors. *See State v. Smith*, 857 S.W.2d 1, 20 (Tenn. 1993) ("Defendant's only right is to have a fair trial at the hands of an unprejudiced, unbiased and impartial jury. He has no right to select certain jurors."). Therefore, any error in excusing the juror based on her questionnaire answers, without *voir dire*, is harmless. *See McDonald v. Shea*, No. W2010-02317-COA-R3-CV; 2012 WL 504510, at *22 (Tenn. Ct. App. Feb. 16, 2012); *Danmole v. Wright*, 933 S.W.2d 484, 486 (Tenn. Ct. App. 1996).

---

[8]The Plaintiff states in his appellate brief that he was "never granted the opportunity to formalize the objection." Based on our review of the record, we must disagree. The record reflects that, when defense counsel brought this juror to the attention of the trial judge by suggesting that her occupation made it inappropriate for her to serve as a juror, the Plaintiff asked for clarification as to why she would be inappropriate. After further discussion, the trial court struck the juror in order to "be safe [rather] than sorry." The Plaintiff made no other comment to the trial court about this juror strike.

The Plaintiff next argues that the trial court erred in excluding any testimony or medical records from Donelson Home Health Care ("DHHC")[9] as a sanction against the Plaintiff for failure to comply with discovery rules.  By way of background, Dr. Sorrels submitted interrogatories to the Plaintiff during pretrial discovery.  The interrogatories in question asked the Plaintiff to identify individuals with knowledge of the facts alleged in the complaint, to identify any treating health care provider expected to offer opinions regarding the cause of injury or standard of care, and to identify any healthcare provider who had ever advised that Dr. Sorrels was negligent or had not met the standards of professional practice.  Tenn. R. Civ. P. 26.02.  The Plaintiff responded to these interrogatories first by objecting to them and then by identifying the individuals in only vague terms; the Plaintiff did not identify DHHC as an entity with witnesses who possessed the described knowledge, nor did he identify any individual DHHC employees.  Dr. Sorrels made several efforts to extract this information from the Plaintiff, but the Plaintiff refused to give a substantive response, instead reserving the "right to call all medical providers" throughout discovery and through the pretrial conference.

At trial, the Plaintiff proceeded to call "five or six" DHHC employees as fact witnesses.  These witnesses had never been previously identified in discovery; instead, their names were disclosed to Dr. Sorrels' counsel the day before trial on a "supplemental witness list."  Perhaps predictably, Dr. Sorrels objected, based on the Plaintiff's failure to disclose the identity of the witnesses.  Dr. Sorrels asked the trial court to disallow the Plaintiff from calling the DHHC witnesses and related medical records at trial, arguing that permitting the Plaintiff to call the employees as fact witnesses would amount to trial by ambush.  Initially, the Plaintiff claimed that the failure to identify the DHHC witnesses was an "oversight."  Later, the Plaintiff took the position that he was not obligated to identify the DHHC witnesses because "medical providers do not need to be listed as Rule 26 experts."  The Plaintiff argued that Dr. Sorrels could have independently ascertained the identity of the DHHC witnesses because they were mentioned in various places in the medical records provided in discovery.  The Plaintiff noted that Dr. Sorrels had the DHHC medical records years before trial, even if the individual names of the DHHC employees were omitted from the Plaintiff's responses to Dr. Sorrels' discovery requests, and so insisted that the DHHC records should not have been excluded at trial.

Ultimately, the trial court agreed with Dr. Sorrels. It held that the Plaintiff was obligated to identify DHHC and the DHHC witnesses during discovery.  The trial court described the Plaintiff's responses to Dr. Sorrels' discovery requests as an attempt to engage in a "shell game."  The trial court fairly implored the Plaintiff's counsel to give some plausible

---

[9]The home health nurse who noticed Mrs. Givens' decline on approximately January 18, 2007, was apparently employed by DHHC.

justification for waiting until the day before trial to identify the DHHC witnesses to Dr. Sorrels' counsel: "Why wouldn't you do that until today? Tell me. Just give me a good reason. Make up one." The trial court found no justification for the Plaintiff's choice to withhold from Dr. Sorrels the identity of DHHC and its employees, and it held that permitting the Plaintiff to use the DHHC evidence at trial would be "just absolutely unfair to the Defendant." Accordingly, the trial court excluded from the trial the DHHC witnesses and the DHHC medical records of the treatment of Mrs. Givens.

The Plaintiff now complains that the trial court's exclusion of both testimony and medical records from DHHC was reversible error. Rule 37.03 of the Tennessee Rules of Civil Procedure provides:

> (1) A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.

Tenn. R. Civ. P. 37.03(1). The Rule authorizes the trial court to sanction a party who violates it by, *inter alia*, assessing expenses and attorney fees, prohibiting the party from introducing designated matters into evidence, striking pleadings or parts thereof, or dismissing the action. *See* Tenn. R. Civ. P. 37.03(1); *see also id.* at 37.02. Thus, once a party is found to be "without substantial justification" for failing to supplement or amend discovery responses, and if such failure is not harmless, that party may not use the evidence that was not disclosed. *See Dean v. Weakley County Bd. of Educ.*, No. 2007-00159-COA-R3-CV, 2008 WL 948882, at *13 (Tenn. Ct. App. Apr. 9, 2008).

From our review of the record, we conclude that the trial court did not abuse its discretion in excluding the testimony and medical records of DHHC and its employees. The Plaintiff was given ample opportunity to identify to Dr. Sorrels DHHC and its employees, but did not do so. The record supports the trial court's holding that the Plaintiff's failure to respond fully to Dr. Sorrels' discovery requests was "without substantial justification." The trial court's decision to sanction the Plaintiff by excluding the DHHC evidence and records was the consequence of the Plaintiff's chosen strategy, and it was fully authorized under Rule 37.03. This argument is without merit.

As a corollary to this argument, the Plaintiff argues that the trial court erred in changing its position on the issue — it initially denied Dr. Sorrels' motion *in limine* to exclude the DHHC evidence but later reversed its position and excluded the DHHC testimony and medical records at trial. The trial judge explained why he reversed the initial ruling:

The Motion in Limine broadly addressed witnesses, but I was under the assumption back when we had this pretrial conference that all these people were at least identified by entity. And I said you'll have to do the best you can, [defense counsel]. But when I found out, obviously, that there was no identification of [DHHC] that's why I excluded them . . . . And I'm going to stand by that ruling.

Thus, the trial judge changed his ruling when he more fully understood the basis for the Plaintiff's failure to disclose the requested information.

Of course, when the trial court changed its position on the admission of the DHHC evidence, the case remained in the bosom of the trial court and its initial ruling was subject to revision. *See Cooper v. Tabb*, 347 S.W.3d 207, 219 (Tenn. Ct. App. 2010). The trial court's explanation was clear, and its decision was not an abuse of discretion. This argument is also without merit.

In another related argument, the Plaintiff claims that the trial court committed reversible error in finding that the DHHC medical records were overly prejudicial pursuant to Rule 403 of the Tennessee Rules of Evidence. Toward the latter part of the trial, long after the trial court had decided to exclude the DHHC medical records as a sanction for the Plaintiff's discovery abuse, the Plaintiff tried to have certain DHHC medical records admitted into evidence through an expert witness who had relied on the records in forming his expert opinion. The trial court disallowed the evidence. It cited two reasons; first, that the Plaintiff was attempting "to back door that which [the trial court] have excluded as substantive proof," and second, that the probative value of the evidence was substantially outweighed by unfair prejudice pursuant to Rule 403 of the Tennessee Rules of Evidence.[10] The Plaintiff now argues that the trial court erred in holding that the evidence was overly prejudicial and excluding it on that basis.

We have already affirmed the trial court's exclusion of the DHHC medical records as a sanction under Rule 37.03. This holding pretermits any issue on whether the exclusion of the evidence was supported by additional grounds. Nevertheless, we find no abuse of the trial court's discretion in its exclusion of the evidence because its prejudicial effect outweighed its probative value. This alleged error is not a basis for reversal.

---

[10]The parties had stipulated that the DHHC records came within the business records exception to the hearsay rule. Tenn. R. Evid. 803(6). This stipulation did not result in a waiver of all objections to the business records, only the hearsay objection.

The Plaintiff also argues on appeal that the trial court erred in declining to permit his medical expert, Dr. Fishbein, to testify about information he obtained from unidentified physicians on the standard of care. At trial, over objection, the trial court permitted Dr. Fishbein to testify about the standard of care applicable to Dr. Sorrels, and to testify that Dr. Sorrels breached that standard. During his testimony, to explain the basis of the standard of care to which he testified, Dr. Fishbein began describing discussions he had had with other physicians regarding the appropriate standard of care: "I have spoke[n] to several physicians about this, without naming names, concerning what they would do . . . ." This prompted an objection by Dr. Sorrels' counsel. The trial court sustained Dr. Sorrels objection: "He [Dr. Fishbein] can talk about the standard of care, but he can't say that Dr. A told me this. He can't conduct a poll." The Plaintiff now argues that the trial court erred in prohibiting Dr. Fishbein from talking about his discussions with other unidentified physicians because the ruling prevented Dr. Fishbein from testifying about "the basis of his knowledge regarding the standard of care in the area wherein Dr. Sorrels practiced medicine."

In his argument, the Plaintiff concedes that, in Tennessee, a physician expert witness cannot base his opinion testimony on the applicable standard of care upon what a majority of physicians would do under similar circumstances. *See Hopper v. Tabor*, No. 03A01-9801-CV-00049, 1998 WL 498211, at *1 (Tenn. Ct. App. Aug. 19, 1998). He claims, however, that Dr. Fishbein's discussions with other physicians were relevant for other purposes. He argues, for example, that Dr. Fishbein's discussions with other physicians helped Dr. Fishbein form his own opinion regarding the applicable standard of care. *See* Tenn. R. Evid. 703. Evidence that other physicians agreed with Dr. Fishbein's opinion, the Plaintiff contends, would have bolstered Dr. Fishbein's own testimony. For these reasons, the Plaintiff argues that because the testimony on Dr. Fishbein's discussion with other physicians was relevant for other purposes, the testimony should have been allowed.

In our view, this argument is sophistry. Moreover, the Plaintiff fails to demonstrate how the exclusion of this testimony affected the outcome of the trial. The trial court did not exclude Dr. Fishbein's testimony on either the applicable standard of care or whether Dr. Sorrels breached the standard of care. If there were any error by the trial court in this regard, it was harmless error.

The Plaintiff next argues that the trial court committed reversible error in permitting Dr. Sorrels' expert witnesses to be in the courtroom during the trial prior to their testimony. Before the trial began, Dr. Sorrels asked the trial court to permit his experts to remain in the courtroom during the trial because Dr. Sorrels planned to call them to respond to the Plaintiff's testimony, so they would need to be familiar with the evidence presented in order to respond to it. The trial court granted that request over the Plaintiff's objection. The Plaintiff now contends that this was reversible error.

In lawyer parlance, Rule 615 of the Tennessee Rules of Evidence is at times called the "sequestration rule" or even just "the Rule." In relevant part, it provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) *a person whose presence is shown by a party to be essential to the presentation of the party's cause.* . . .

Tenn. R. Evid. 615 (emphasis added). The 2004 advisory commission comments to Rule 615 state explicitly that expert witnesses are generally considered "essential" within the meaning of the Rule, and are therefore not excluded from the courtroom during the trial. Tenn. R. Evid. 615 advisory comm'n comments; *see State v. Jordan*, 325 S.W.3d 1, 40 (Tenn. 2010); *State v. Bane*, 57 S.W.3d 411, 423 (Tenn. 2001).

The Plaintiff concedes that experts are generally considered "essential" under Rule 615, but he argues that, because Dr. Sorrels himself is a medical doctor, it was unnecessary for his experts to be present during trial in order for him to understand the medical testimony presented. This is a specious argument indeed. The experts are not present during the trial in order for the opposing party to understand the expert testimony; the advisory commission comments to Rule 615 state that an expert witness may be essential "to help *the lawyer* understand opposing testimony." Tenn. R. Evid. 615 advisory comm'n comments. The trial court did not abuse its discretion in permitting Dr. Sorrels' experts to remain in the courtroom. Furthermore, the Plaintiff has not shown that this alleged error would have affected the outcome of this case. *Id.* Thus, even if the trial court's decision were an error, we would hold it to be harmless error.

The Plaintiff's next three issues arise out of the trial court's actions during the pretrial conference. The Plaintiff argues that the trial court erred by declining to compel Dr. Sorrels' experts to answer questions about their medical malpractice insurance carriers posed during the experts' depositions, and by refusing to permit the Plaintiff to *voir dire* Dr. Sorrels himself about his medical malpractice insurance carrier outside the presence of the jury.[11] The Plaintiff concedes that the insurance information was not admissible to show negligence, but he contends that it "was intended to establish and/or dispel any consideration of bias on behalf of the expert witness's part." He sought to establish that Dr. Sorrels and his experts

---

[11]Dr. Sorrels points out that the Plaintiff never filed a motion to compel Dr. Sorrels' experts to answer the questions, and that the issue was first raised by the Plaintiff at the pre-trial conference. Because we hold in favor of Dr. Sorrels on this issue, we need not address whether the Plaintiff's objection was properly made.

were all insured by SVMIC, and that the experts were testifying on Dr. Sorrels' behalf so that their own SVMIC insurance premiums would not increase. The Plaintiff argues that he was unable to establish this bias because the trial court erroneously refused to permit him to discover information about the medical malpractice insurance of Dr. Sorrels and his experts. This error, he claims, requires reversal of the judgment.

Rule 411 of the Tennessee Rules of Evidence provides: "Evidence that a person was or was not insured against liability is not admissible upon issues of negligence or other wrongful conduct." The Rule itself contains a built-in exception, in that it "does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control or *bias or prejudice of a witness*." Tenn. R. Evid. 411 (emphasis added). For this issue, the Plaintiff relies on the emphasized portion of Rule 411, arguing that he was erroneously precluded from obtaining the evidence necessary to show bias.

After reviewing the appellate record, it is clear that the Plaintiff failed to establish any foundation for his argument that Dr. Sorrels' experts were biased in Dr. Sorrels' favor based on a common malpractice insurance carrier. Outside the presence of the jury, the trial court permitted the Plaintiff to ask the defense experts whether they knew the identity of Dr. Sorrels' insurance carrier; all of the defense experts who were asked this question answered that they did not.[12] If the expert does not know the identity of the defendant's liability insurance carrier, then he cannot have a bias based on a common insurance carrier. Under similar circumstances, this Court held that a trial court did not abuse its discretion in excluding evidence of medical malpractice insurance proffered to show bias where the proponent of the evidence does not establish a foundation to support a showing of bias. *See Heath v. Memphis Radiological Prof'l Corp.*, 79 S.W.3d 550, 558-59 (Tenn. Ct. App. 2001) (noting that defendant's experts were not aware of the defendant's liability insurance carrier); *Roberson v. Netherton*, No. 01A01-9310-CV-00470, 1994 WL 164153, at *2-3 (Tenn. Ct. App. May 4, 1994) (holding that evidence of insurance was not admissible to show bias when the defense experts did not know how their insurance rates were affected by an adverse judgment). For the same reason, the trial court in this case did not abuse its discretion in refusing to compel Dr. Sorrels' witnesses to identify their medical malpractice insurance carriers or in refusing to allow the Plaintiff to *voir dire* Dr. Sorrels about his own insurance carrier.

The Plaintiff further argues on appeal that the trial court erred in permitting Dr. Sorrels, throughout the trial, to make repeated references to other medical malpractice lawsuits filed

---

[12]It appears that Dr. Juli Horton was not asked whether she knew the identity of Dr. Sorrels' medical malpractice insurance carrier.

by the Plaintiff against other defendants that were also based on the wrongful death of Mrs. Givens. As background, the Plaintiff filed two other lawsuits against physicians other than Dr. Sorrels and against Vanderbilt, alleging that Mrs. Givens' death was caused by negligence that occurred in September 2006, prior to the incidents that are the subject of the instant lawsuit. The Plaintiff argues that any reference to those lawsuits should have been prohibited under Rule 403 of the Tennessee Rules of Evidence, which states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury . . . ." By permitting evidence of the other lawsuits, the Plaintiff claims, "the jury was faced with the possibility that Plaintiff could indeed receive a double recovery for his losses and/or that others, not involved in the present lawsuit, could be held responsible for the wrongs alleged by the Plaintiff." The Plaintiff acknowledges that the trial court gave a curative instruction to the jury that they were to consider only the fault of Dr. Sorrels, but he argues that this and other curative instructions did little to keep the jury from concluding from this evidence either that a third party was responsible or that the Plaintiff sought to get a double recovery by pursuing multiple lawsuits. For this reason, the Plaintiff argues that he did not receive a fair and impartial trial, and he asks this Court to reverse the judgment on this basis.

In his appellate briefs, the Plaintiff does not cite to the pages in the record containing the alleged impermissible references to other lawsuits, except to say in the reply brief that it "was done so through the cross examination of Rachel Givens," without specific reference to a record page cite. After reviewing the record, we surmise that the Plaintiff is referring to an excerpt in which Rachel first testified that Dr. Sorrels' conduct in January 2007 caused her mother's death, and on cross-examination Dr. Sorrels' counsel sought to impeach Rachel's testimony by asking her about the other lawsuits. Of course, "statements contained in pleadings filed in other actions may . . . be used as evidentiary admissions as long as they are inconsistent with the party's present contentions." *Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. Ct. App. 1987); *see Baxter v. Vandenheovel*, 686 S.W.2d 908, 910-11 (Tenn. Ct. App. 1984). Rachel's testimony asserting that Dr. Sorrels' negligence was the sole cause of Mrs. Givens' death is directly contrary to the prior assertion that Vanderbilt and its doctors caused Mrs. Givens' death.[13] We cannot conclude that the trial court abused its discretion in permitting evidence of the Plaintiff's other lawsuits for purposes of impeachment.

In a related argument, the Plaintiff claims that the trial court erred in denying the Plaintiff's motion for a mistrial, made in response to Dr. Sorrels' repeated references to other lawsuits.

---

[13]As we have stated, Rachel is no longer a named plaintiff in this lawsuit. Nevertheless, she signed the complaint as an original plaintiff and alleged in her testimony that Dr. Sorrels caused Mrs. Givens' death. Under these circumstances, it was clearly permissible for Dr. Sorrels' counsel to cross-examine Rachel about the contradiction between the assertions in this lawsuit versus those made in the other lawsuits.

-15-

Such references, he claims, continuously implied to the jury that a third party was the party who was truly at fault for Mrs. Givens' untimely death. In addition, the Plaintiff argues, Dr. Sorrels repeatedly asserted that the Plaintiff or someone in Mrs. Givens' family had some degree of fault for failing to properly care for Mrs. Givens. The Plaintiff asserts that such allegations were in contravention of the trial court's instruction that only Dr. Sorrels' fault would be considered in this case, without applying the doctrine of comparative fault. For these reasons, the Plaintiff claims, a mistrial was warranted, and the trial court erred in declining to grant the Plaintiff's motion.

As noted above, the trial court did not err in permitting Dr. Sorrels to refer to the Plaintiff's other lawsuits for purposes of impeachment. Moreover, the trial court admonished the jury on multiple occasions to consider only the fault of Dr. Sorrels, no other person. The jury verdict form contained only Dr. Sorrels' name, and the jury was specifically instructed to consider only his fault in their deliberations. From our review of the record as a whole, we reject the Plaintiff's argument that the trial court erred in declining to grant the Plaintiff's motion for a mistrial.

The Plaintiff next argues that the trial court erred in instructing the jury as to Tennessee Pattern Jury Instructions 6.21 and 6.12. Instruction 6.21, regarding a patient's responsibility to follow instructions, reads:

> A patient must follow all reasonable instructions by the physician regarding the patient's care, activities and treatment. A physician is not liable for any injury caused by the patient's failure to follow those instructions. The physician remains responsible for any injury caused by the physician's own negligence.

Instruction 6.12, entitled "Perfection Not Required," reads:

> By undertaking treatment a physician does not guarantee a good result. A physician is not negligent merely because of an unsuccessful result or an error in judgment. An injury alone does not raise a presumption of the physician's negligence. It is negligence, however, if the error of judgment or lack of success is due to a failure to have and use the required knowledge, care and skill as defined in these instructions.

The Plaintiff argues that the trial court's decision to give Instruction 6.21 was inappropriate in this case because the trial court had explicitly held that the fault of third parties — including Mrs. Givens (the patient) — was not to be considered during the trial. The Plaintiff claims that Instruction 6.21 refers directly to third-party liability and, thus, placed the issue

of comparative fault and third-party fault before the jury. Instruction 6.12, the Plaintiff contends, implied facts that were not established at trial. The Plaintiff notes that Dr. Sorrels insisted that he had made no mistake or error in judgment, so the "perfection not required" (or "honest mistake") jury instruction served only to confuse the jury.

In reviewing the jury instructions given by the trial court, we review them as a whole, rather than piecemeal. Importantly, both of the instructions to which the Plaintiff objects constitute correct statements of Tennessee law. When read with the other instructions given to the jury, the jury instructions at issue are neither confusing nor misleading, and the instructions as a whole fairly define the legal issues involved in the case. *See Nye*, 347 S.W.3d at 699. Under this standard, we conclude that the trial court's inclusion of Instructions 6.21 and 6.12 in the jury instructions was not reversible error.

Finally, the Plaintiff argues that the trial court abused its discretion in awarding Dr. Sorrels the full amount of the discretionary costs claimed, because any costs related to videotapes or videotaping services are not allowable as a matter of law under Rule 54.04 of the Tennessee Rules of Civil Procedure. We note that the Plaintiff did not make this specific argument to the trial court. Instead, he objected to any award of any discretionary costs or, in the alternative, he asked the trial court to reserve ruling on this issue pending appeal. Under these circumstances, any challenge to the specific costs of videotaping is waived. Furthermore, from our review, the discretionary costs claimed by Dr. Sorrels were reasonable. Accordingly, we affirm the trial court's award of discretionary expenses in favor of Dr. Sorrels in its entirety.

The Plaintiff acknowledges that some of the alleged errors raised on appeal may be deemed harmless error if considered alone. The Plaintiff argues forcefully that the aggregation of the trial court's errors cannot be considered harmless; under the cumulative error doctrine, the Plaintiff insists that he was denied a fair and impartial trial.[14] Respectfully, we disagree. In light of our decision on the specific issues raised above, and from a careful consideration of the entire record, the Plaintiff received a full, fair, and impartial trial in this cause. For this reason, we affirm the judgment entered on the verdict.

---

[14]Pursuant to the Court's request at oral argument, Dr. Sorrels filed supplemental authority on the cumulative error doctrine.

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal are to be taxed to the Plaintiff/Appellant Aubrey E. Givens, Individually and as Administrator of the Estate of Jessica E. Givens, Deceased, and his surety, for which execution may issue, if necessary.


_____
HOLLY M. KIRBY, JUDGE