# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 10, 2026 Session

## STATE OF TENNESSEE v. JESSE WAYNE CRADDOCK

**Appeal from the Criminal Court for Wilson County**
No. 21-CR-803    Brody Kane, Judge

_____

### No. M2024-01886-CCA-R3-CD

_____

Defendant, Jesse Wayne Craddock, appeals his Wilson County Criminal Court jury convictions of felony murder and aggravated child neglect, arguing that the evidence was insufficient to support those convictions, that the statute proscribing aggravated child neglect is unconstitutionally vague, that the trial court erred by denying his motion to suppress evidence seized from his person, that the trial court erred by failing to instruct the jury on intoxication, and that the imposition of a life sentence for his conviction of felony murder in the perpetration of aggravated child neglect amounts to cruel and unusual punishment. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

G. Frank Lannom and Tyler Stanfield, Lebanon, Tennessee (on appeal); and Adam W. Parrish and Donna Wagner, Mount Juliet, Tennessee (at trial), for the appellant, Jesse Wayne Craddock.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jason L. Lawson, District Attorney General; and Justin G. Harris and Thomas H. Swink, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant's convictions arose from the April 3, 2021 death of the victim, H.C., who was Defendant's infant daughter.[1]

## Factual and Procedural Background

The Wilson County Grand Jury charged Defendant with one count of felony murder in the perpetration of aggravated child neglect, one count of aggravated child neglect, and one count of simple possession of fentanyl.

The core facts of this case are largely undisputed, and the immediate events leading to the victim's death were captured on surveillance video. On April 3, 2021, Defendant, his wife, Kelly Craddock, and the infant victim breakfasted together at Waffle House before returning to the Travel Inn in Lebanon where the family was living so that Mrs. Craddock could get ready for work. Just after 2:00 p.m., Mrs. Craddock left their motel room to walk to her job at the Subway restaurant inside the Pilot gas station. Ms. Craddock said Defendant regularly sought to purchase Lortab and Percocet to treat pain in his feet and legs from a prior injury. Defendant did not have a prescription for either drug. Defendant crushed and snorted the pills that he was able to purchase illicitly. Despite this, Mrs. Craddock said that Defendant was sober when she left and that there were no drugs in their room at the Travel Inn.

After Mrs. Craddock left, Defendant interacted with the family staying in the adjacent motel room, which included a man named Daniel Law, his wife, and his daughter. Just after 3:00 p.m., Mr. Law entered the Craddock's room and stayed for about ten minutes before returning to the Laws' room. Mr. Law then walked back into the Craddocks' room with his hand concealed inside his hoodie. A couple of minutes later, Mr. Law and Defendant exited the Craddocks' room and smoked cigarettes. Defendant then went back into his room and came out holding the victim. Defendant allowed Mr. Law's wife and daughter to hold the baby while he went into his room alone. Defendant came back outside eighteen seconds later.

The Laws returned to their room at approximately 4:15 p.m., and Defendant remained outside holding the victim. Within one minute, Defendant lost his balance and leaned back against the wall. Defendant slid down the wall, lost his balance, and dropped to his knees. Defendant then fell face first onto the victim, completely covering her. The victim kicked her legs for approximately three minutes as she lay pinned beneath Defendant. Although Defendant briefly attempted to lift his head, he again apparently lost consciousness and stopped moving.

---

[1] In keeping with the policy of this court, we do not identify the minor victim by name.

Just over ten minutes later, Mr. Law and his wife exited their room. Mr. Law shook Defendant before going into his own room and coming back out with his daughter. Mr. Law's wife and daughter got into a vehicle while Mr. Law returned to his room and left with something in his right hand. The Laws left in their vehicle at 4:30 p.m., and Mr. Law returned three minutes later on foot with the owner of the hotel. Mr. Law rolled Defendant over and then picked the victim up and carried her into the Craddocks' room. Mr. Law left and did not return.

The owner of the hotel contacted his brother, who called 911. Emergency personnel arrived a short time later and discovered the victim lying on the floor in the Craddocks' room. The victim was not breathing and had no pulse. Despite attempted life-saving measures both at the scene and at the hospital, the victim was pronounced dead at 5:19 p.m. Dr. Miguel Laboy, a forensic pathologist, performed the autopsy of the victim's body and determined that "the cause of death is asphyxia[,] and the manner of death is accident." He said that he found no evidence of disease or other natural cause for the asphyxia. Dr. Laboy watched the surveillance video and observed Defendant's lying on top of the victim "for more than ten minutes." He noted petechiae in the victim's thymus, heart, and lungs, which could have been caused by Defendant's lying on her, from the CPR, or both. Dr. Laboy did not identify any other evidence of trauma to the victim's body. He said that fluid seen leaking from the victim on the surveillance video could have been vomit, pulmonary edema, or even milk from the stomach and that, in any event, the leakage of that fluid did not indicate the actual time of her death.

Defendant was largely unresponsive and bleeding from his face when police and first responders arrived. Officer Gary Parrish asked Defendant if he had any weapons, and Defendant replied that he did not. Officer Parrish patted Defendant down and, while officers were trying to determine what had happened to Defendant and the victim, observed something inside Defendant's sock. Because he thought it might be a "bindle," which he said was a small package for narcotics, and because authorities and emergency medical personnel thought an overdose was possible, Officer Parrish removed the item and confirmed that it was a "bindle" containing a white powdery substance that he thought could be heroin. Mr. Law told authorities that he had planned to lend a Dr. Seuss book to Defendant to read to the victim, and, after searching the Laws' room, authorities matched the paper used to make the "bindle" to a page from a Dr. Seuss book that belonged to Mr. Law's daughter.

Concerned that Defendant might have overdosed, Officer Parrish instructed other officers to take Defendant to the hospital. At the hospital, medical personnel administered Narcan, an opiate antagonist, to Defendant, and he regained consciousness. Defendant's blood was drawn for the purposes of toxicology testing.

Forensic testing of the white powdery substance inside the "bindle" established that it was an amount of fentanyl, a Schedule II controlled substance, so small as to be classified

3

as "residue." Testimony established that fentanyl is one hundred times more powerful than morphine and that inhalation of fentanyl would provide an "almost immediate" reaction. Forensic testing of the blood drawn from Defendant at the hospital established the presence of "fentanyl at a level of 4 nanograms per milliliter" and naloxone. That same blood sample was negative for alcohol, but the alcohol test of Defendant's blood conducted at the hospital showed a serum alcohol level of 29 milligrams per deciliter, which translated via reverse extrapolation to an estimated blood alcohol content of .036 to 0.057 at the time Defendant fell onto the victim. Authorities found two empty "airline bottles" of Fireball whiskey in the trash can and a partially empty bottle of Crown Royal Apple whiskey in the freezer compartment of the refrigerator inside the Craddocks' room. Defendant admitted to nurses that he had consumed alcohol.

Expert testimony established that Defendant could not have absorbed the white powder from the dry "bindle" that was found inside his sock because "fentanyl cannot be absorbed as a dry powder thorough the skin." The combination of alcohol and fentanyl would have created "synergistic central nervous system depression," as would combining other prescription opioids such as Percocet or Lortab with alcohol.

Following a *Momon* colloquy, Defendant elected not to testify and chose not to present proof. Based upon the foregoing evidence, the jury convicted Defendant as charged. The trial court imposed the statutorily required sentence of life imprisonment for Defendant's conviction of felony murder and, following a sentencing hearing, imposed concurrent sentences of twenty-three years for Defendant's conviction of aggravated child neglect and eleven months and twenty-nine days for Defendant's conviction of simple possession.[2] Defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

## Analysis

On appeal, Defendant challenges the sufficiency of the convicting evidence, the constitutionality of the aggravated child neglect statute, the denial of his motion for a bill of particulars, the denial of his motion to suppress, the trial court's refusal to instruct the jury on intoxication, and the constitutionality of the life sentence imposed for his conviction of felony murder in the perpetration of aggravated child neglect. We consider each claim in turn.

### I. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions of felony murder in the perpetration of aggravated child neglect and aggravated child neglect because the State failed to establish that he acted knowingly or that his neglect resulted in

---

[2] Defendant also was charged with and convicted of simple possession of fentanyl, a Class A misdemeanor. He does not challenge that conviction on appeal.

4

the victim's death. The State contends that the evidence was sufficient to support Defendant's convictions.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child neglect." Tenn. Code Ann § 39-13-202(a)(2). "No culpable mental state is required for conviction" of felony murder "except the intent to commit the enumerated offense[]," here, aggravated child neglect. *Id.* § 39-13-202(b); *see also State v. Gardner*, 716 S.W.3d 388, 406 (Tenn. Crim. App. 2024) (stating that "[n]o culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony") (citations omitted).

As charged here, aggravated child neglect is "child neglect, as defined in § 39-15-401(b)" that "results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). Child neglect, as is relevant here, means to neglect a child "so as to adversely affect the child's health and welfare." *Id*. § 39-15-401(b). Child neglect has "three essential elements: (1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." *State v. Sherman*, 266 S.W.3d 395, 404 (Tenn. 2008) (first citing *State v. Mateyko,* 53 S.W.3d 666, 670 (Tenn. 2001); and then *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). To obtain a conviction for child neglect, the State must establish "that a defendant owes a legal duty to the child," *id.* (citing *Mateyko,* 53 S.W.3d

at 671), and that "the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare," *Mateyko*, 53 S.W.3d 672. Child neglect "is a nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the defendant's conduct achieves." *Mateyko*, 53 S.W.3d at 673 (citing *Ducker*, 27 S.W.3d at 896-97). As such, the State need not establish that the defendant knew that the neglect would result in serious bodily injury. *State v. Weems*, 619 S.W.3d 208, 224 (Tenn. 2021) (citing *State v. Prater*, 137 S.W.3d 25, 34 (Tenn. Crim. App. 2003)).

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

Tenn. Code Ann. § 39-15-402(c). We have "held that 'the legislature intended the threshold of injury necessary to establish "serious bodily injury to the child" would be less than that required to establish "serious bodily injury" under the general definition of the criminal code.'" *State v. First*, No. W2024-01823-CCA-R3-CD, 2025 WL 3124684, at *4 (Tenn. Crim. App. Nov. 7, 2025) (quoting *State v. Mark*, No. M2014-00651-CCA-R3-CD, 2015 WL 4720038, at *36 (Tenn. Crim. App. Aug. 10, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015)).

"The code does not provide for a specific definition of 'neglect'" as that term is used in Code section 39-15-401(b). *Gardner*, 716 S.W.3d at 406 (quoting *Sherman*, 266 S.W.3d at 405). This court has cited with approval the *Black's Law Dictionary* definition of "neglect as meaning 'to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in doing or omit a given act.'" *Id.* (quoting *Neglect*, *Black's Law Dictionary* (6th ed. 1990)); *see also State v. Clark*, No. M2023-01427-CCA-R3-CD, 2025 WL 2985293, at *36 (Tenn. Crim. App. Oct. 23, 2025) (same). "[C]hild neglect is a continuing offense" that "continues 'until the person responsible for the neglect takes reasonable steps *to remedy the adverse effects* to the child's health and welfare caused by the neglect'" and can include "several adverse effects [resulting] from one period of neglect." *Mateyko*, 53 S.W.3d at 671 (quoting *State v. Adams*, 24 S.W.3d 289, 296 (Tenn. 2000)). In defining child neglect as a continuing offense, our supreme court looked to the use of the term "neglect" in other portions of the Code and observed that "[n]eglect simply does not lend itself to division into segments of discrete acts each having various points of termination." *Adams*, 24 S.W.3d at 296. Using these same statutes as a backdrop, the high court concluded that "a child is neglected whenever the breach of a legal duty endangers the health or welfare of that child or

6

otherwise places the child's health or welfare at some risk of harm." *Mateyko*, 53 S.W.3d at 671 (citing *Adams*, 24 S.W.3d at 295-96).

The evidence adduced at Defendant's trial established that although he knew that he would be solely responsible for the care of his four-month-old daughter, Defendant elected to knowingly consume alcohol. The evidence further supported the inference that Defendant knowingly attempted to obtain opiate pain medication for which he did not have a prescription. Ms. Craddock testified that Defendant routinely sought to purchase Percocet and Lortab illegally because he did not have health insurance and that he snorted the medication. The video evidence showed Mr. Law walking into Defendant's room with his hand inside his hoodie, and authorities matched the paper "bindle" found in Defendant's sock to a Dr. Seuss book owned by Mr. Law. That "bindle" and Defendant's blood both tested positive for the presence of fentanyl. Contrary to Defendant's assertion, the expert testimony established that transdermal absorption of dry fentanyl was impossible and that Defendant could not have absorbed the powder from the "bindle" in his sock. Moreover, the amount of powder remaining in the "bindle" was so small as to be classified as "residue."

Defendant did not argue that he otherwise involuntarily consumed alcohol and drugs but instead argued that he was unaware that the drugs he consumed contained fentanyl as opposed to a form of opiate with which he was more familiar. This evidence was sufficient for the jury to infer that Defendant obtained drugs from Mr. Law, a man he had only ostensibly known for a short time, and that he used some means to introduce the drug into his bloodstream, whether by his usual method of snorting or some other mode. No evidence suggested that Defendant did not knowingly consume the drugs that he obtained from Mr. Law, regardless of whether he knew what was in any pills he used. Defendant's knowing ingestion of alcohol and illegal drugs of unknown origin at a time when he was aware that he would be solely responsible for the victim's care satisfied the mens rea requirement for Code section 39-15-402. Contrary to Defendant's assertion that his negligence led to the victim's death, his own knowing conduct led directly to his passing out and falling onto the victim. *See State v. Blair*, No. M201501231CCAR3CD, 2016 WL 6776356, at *7 (Tenn. Crim. App. Nov. 16, 2016) (stating that "Defendant, who chose to take prescription medication with several alcoholic drinks, cannot now claim that her subsequent acts were completely involuntary"); *State v. Bray*, No. M2007-01301-CCA-R3-CD, 2008 WL 624914, at *13 (Tenn. Crim. App. Mar. 10, 2008) (stating that this court could not "conclude the Defendant's voluntary taking of [an illegally obtained] medication, to which he alleges he had an adverse reaction, constitutes involuntary intoxication").

As a direct result of his knowing consumption of drugs and alcohol, Defendant collapsed on top of the victim, a completely helpless infant. As Defendant lay unconscious on top of her, the four-month-old victim suffocated and died. This evidence was sufficient to support Defendant's convictions of felony murder in the perpetration of aggravated child neglect and aggravated child neglect.

7

Further contrary to Defendant's assertions, the State was not required to prove a "separate act of neglect" to support his convictions of aggravated child neglect and felony murder in the perpetration of aggravated child neglect. The cases cited by Defendant involved charges of both aggravated child abuse and aggravated child neglect. When a defendant has been charged with both aggravated child abuse and aggravated child neglect, principles of Double Jeopardy require that the evidence establish neglect separate and apart from the initial act of child abuse that supports the child abuse charge. *See State v. Dewitt*, 2016 WL 6638857, at *11 (Tenn. Crim. App. November 10, 2016); *State v. Gold*, No. E2012-00387-CCA-R3-CD, 2013 WL 4278760 (Tenn. Crim. App. Aug. 15, 2013); *State v. Raymundo*, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *14-15 (Tenn. Crim. App. Nov. 10, 2010); *State v. Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010); *State v. Wiggins*, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App. Nov. 2, 2007). Defendant was not charged with both child abuse and child neglect, and, consequently, those cases do not apply to his case.

## II. Constitutionality of Child Neglect Statute

Defendant asserts that the statute proscribing child neglect is unconstitutionally vague because it does not define the word "neglect." The State asserts that Defendant waived consideration of this issue by failing to raise it prior to trial and that, in any event, he is not entitled to relief.

The question whether a facial challenge to the constitutionality of the statute must be raised prior to trial to preserve the issue for appeal remains open. *See State v. Woodard*, No. E2016-00676-CCA-R3-CD, 2017 WL 2590216, at *10 (Tenn. Crim. App. June 15, 2017) (stating that because "[a] claim that the proscriptive statute is facially unconstitutional amounts to a claim that the trial court lacks jurisdiction to impose a conviction under the statute," "a *facial constitutional challenge* to the *proscriptive statute* is not subject to the waiver provision of Rule 12" (citing *State v. Dixon*, 530 S.W.2d 73, 74-75 (Tenn. 1975)). Regardless of whether Defendant has waived consideration of this issue, however, he is not entitled to relief because "based on the law now existing," he cannot establish the breach of a clear and unequivocal rule of law. *State v. Minor*, 546 S.W.3d 59, 74 (Tenn. 2018); *see State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022) ("To obtain relief under plain error review, the defendant bears the burden of persuading the appellate court that . . . (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice." (citation omitted)).

In *State v. Goodwin*, this court considered and rejected the claim "that Code section 39-15-402(a)" was unconstitutionally vague because it "fails to adequately define 'neglect,' which precludes an individual from determining what proof is required to sustain a

conviction." *State v. Goodwin*, No. M2022-00540-CCA-R3-CD, 2023 WL 7324497, at *36 (Tenn. Crim. App. Nov. 7, 2023). There, we pointed to our repeated holdings "that [t]he common understanding of neglect is to ignore or disregard or to fail to care for or attend to sufficiently or properly." *Id.*, at *38 (quoting *State v. Smith*, No. 1153, 1990 WL 134934, at *3 (Tenn. Crim. App. Sept. 20, 1990)) (second alteration in *Goodwin*) (internal quotation marks omitted); and citing *State v. Burton*, No. E2015-00879-CCA-R3-CD, 2016 WL 3351316, at *4 (Tenn. Crim. App. June 9, 2016)). We concluded that given "the plain meaning of the term 'neglect' used in the statute," the proscribing statute was "sufficiently clear to put an ordinary person of common intelligence on notice that it is a crime to knowingly fail to care for a child where such an omission results in an adverse effect the child's health and welfare and where the act of neglect results in serious bodily injury to the child." *Id.* (first citing Tenn. Code Ann. § 39-15-402(a); and then *Burton*, 2016 WL 3351316, at *4; and then *Smith*, 1990 WL 134934, at *3); *see also State v. Adler*, No. W2001-00951-CCA-R3CD, 2002 WL 1482704, at *6 (Tenn. Crim. App. Feb. 19, 2002) (rejecting defendant's claim that statute was "unconstitutionally vague and overbroad because the words 'injury,' 'neglect,' and 'welfare' are not defined") (first citing *State v. Turner and Webster*, No. W1999-00530-CCA-R3-CD, (Tenn Crim. App. June 21, 2000), *perm. app. denied* (Tenn. 2001) (holding that terms "neglect" and "injury" are not unconstitutionally vague); and then *State v. Hodges*, No. 01C01-9804-CR-00170, 1999 WL 618861, at *11-12 (Tenn. Crim. App. Aug. 11, 1999), *perm. app. denied* (Tenn. 2000) (holding that phrase "inflict injury" is not unconstitutionally vague); and then *Smith*, 1990 WL 134934, at *3 (holding that phrase "adversely affect the child's health and welfare" is not unconstitutionally vague)). Given that this court has consistently concluded that the statute is not unconstitutionally vague, we see no need to revisit the issue in depth and instead adopt fully the analysis in *Goodwin* that the absence of a definition for the term "neglect" does not render the statute unconstitutional.

### III. Bill of Particulars

Defendant asserts that the trial court erred by denying his motion for a bill of particulars, arguing that the failure of the State to submit a bill of particulars deprived him of the information necessary to his defense. The State asserts that Defendant has waived review of this issue by failing to include in the appellate record the trial court's order denying his motion. In the alternative, the State asserts that the trial court did not err.

Prior to trial, Defendant moved for a bill of particulars. Although the trial court denied Defendant's motion as indicated on the "MOTIONS, ETC., LIST" filed on November 7, 2022, the record contains neither the trial court's order denying the motion nor the transcript of the hearing on the motion.[3] Without these items, review of this issue

---

[3] Defendant also failed to provide citations to the record in support of his claim and did not file a reply brief to correct these omissions even after being alerted to them by the State's brief. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

is not possible. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "As the appellant, it was the Defendant's burden to prepare an adequate record for appellate review." *State v. Rimmer*, 623 S.W.3d 235, 296-97 (Tenn. 2021) (citing *Ballard*, 855 S.W.2d at 560)). "When the record is incomplete and does not contain information relevant to a particular issue, this court may not make a ruling," and instead "must presume the correctness of the trial court's ruling." *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (citing *State v. Cooper*, 736 S.W.2d 125, 131 (Tenn. Crim. App. 1987)).

Defendant did not ask this court to review this issue for plain error. *See State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Because the '[d]efendant bears the burden of persuasion to show that he is entitled to plain error relief,' a defendant's failure to request this relief weighs against any such consideration on our own." (citations omitted) (alteration in *Thompson*)). Additionally, he did not reply to the State's waiver argument. *See id.* ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error relief." (citation omitted)). The record, such as it is, supports the denial of the request for a bill of particulars given that the sole "purpose of the bill of particulars is to provide information about the details of the charge," including "details as to the nature, time, date, or location of the offense." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997) (citations omitted). The State relied on the video evidence and the results of forensic testing, all of which information was provided to Defendant prior to trial, to establish Defendant's guilt. We conclude Defendant is not entitled to relief.

IV. Motion to Suppress

Defendant asserts that the trial court erred by denying his motion to suppress the "bindle" seized from his sock at the scene as well as the body worn camera footage that captured the interaction. Again, the State contends that Defendant has waived consideration of this issue by failing to include in the record the trial court's order denying his motion and by failing to raise a contemporaneous objection to the admission of this evidence. In the alternative, the State asserts that the trial court did not err.

At the hearing on the motion for new trial, the trial court concluded that "this was an emergency situation" because the victim was in serious distress and Defendant was incoherent. However, without the trial court's pretrial order denying the motion to suppress or the transcript of the hearing on Defendant's motion, we lack the information necessary to determine this issue. Consequently, we "may not make a ruling" and instead "must presume the correctness of the trial court's ruling." *Richardson*, 875 S.W.2d at 674. Moreover, Defendant did not ask us to review this issue for plain error, did not respond to the State's waiver argument by filing a reply brief, and failed to provide citations to the record in support of his argument. *See State v. Thompson*, No. W2022-01535-CCA-R3-

CD, 2023 WL 4552193, at \*5; Tenn. Ct. Crim. App. R. 10(b). Under these circumstances, Defendant has waived our consideration of this issue.

## V. Jury Instructions

Defendant asserts that the trial court erred by refusing to instruct the jury on voluntary and involuntary intoxication. The State contends that Defendant waived his challenge to the trial court's denial of a voluntary intoxication instruction and that, in any event, the trial court did not err by refusing Defendant's request.

Prior to trial, Defendant asked the trial court to provide the jury with instructions regarding the effect of intoxication, whether voluntary or involuntary, on the mental state requirement for the charged offenses. The State opposed the motion, and the court took it under advisement, noting that any decision was premature until the proof at trial was complete. At the conclusion of the State's proof, Defendant renewed his request for an instruction "as to both voluntary and involuntary intoxication," asserting that expert testimony established that fentanyl could be introduced transdermally and "that the substance he ingested was not something he thought it was." The State argued that regardless of whether the substance ingested was what Defendant expected it to be, Defendant voluntarily consumed both it and alcohol, making an instruction on involuntary intoxication inappropriate. The State argued that Defendant's act of ingesting the substances, which occurred before he was intoxicated, was the point at which he began to neglect the victim, making an instruction on voluntary intoxication inappropriate. Ultimately, Defendant agreed that voluntary intoxication was not applicable and that "[t]he whole point of this is involuntary" intoxication. The court denied the request for an instruction on involuntary intoxication, finding that no evidence had been presented to suggest "that this [is] a situation of involuntary intoxication." The trial court stated that it would change its mind if Defendant testified that he had not voluntarily consumed fentanyl. The court reiterated its holding at the hearing on the motion for new trial, stating, "I think you're responsible for what you . . . put in your body."

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. Thus, "[t]he trial court has the duty to provide a complete charge of the law applicable to the facts of a case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial." *State v. Anderson*, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997). When reviewing the adequacy of a particular jury instruction, this court must review the instruction in the context of the whole charge rather than in isolation. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *Clark*, 452 S.W.3d at 295 (first citing *State v.*

11

*Hawkins,* 406 S.W.3d 121, 128 (Tenn. 2013); and then *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011)).

Code section 39-11-503 provides:

(a) Except as provided in subsection (c), intoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state.

. . . .

(c) Intoxication itself does not constitute a mental disease or defect within the meaning of § 39-11-501. However, involuntary intoxication is a defense to prosecution, if, as a result of the involuntary intoxication, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated.

Tenn. Code Ann. § 39-11-503(a), (c). "'Voluntary intoxication' means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known," and involuntary intoxication is intoxication "that is not voluntary." *See id.* § 39-11-503(d).

We agree with the trial court that no evidence supported an inference that Defendant's intoxication was anything other than voluntary. The record established that Defendant voluntarily introduced into his body alcohol and a substance "the tendency of which to cause intoxication was known or ought to have been known" to him. Tenn. Code Ann. § 39-11-503(d); *see also State v. Kain*, 24 S.W.3d 816, 819 (Tenn. Crim. App. 2000) (holding that "the defendant, having voluntarily ingested substances which he knew or should have known could result in intoxication, was 'voluntarily' intoxicated"); *cf. Baggett v. State*, 220 Tenn. 592, 597, 421 S.W.2d 629, 631 (1967) (stating that "an accused may not successfully plead involuntary intoxication because he drank at the request or suggestion of another . . . or because he drank to relieve physical pain, or from an uncontrollable desire caused by long indulgence of the appetite" (citation omitted)). Thus, the trial court did not err by refusing to instruct the jury on involuntary intoxication.

Regarding voluntary intoxication, we agree with the State that Defendant abandoned this request when he agreed with the trial court that involuntary intoxication was the only issue and did not follow up on his request for a voluntary intoxication instruction. Furthermore, the trial court did not err by failing to give a voluntary intoxication instruction. Defendant was charged with felony murder in the perpetration of aggravated child neglect and aggravated child neglect. The only mens rea requirement for felony murder is the intent to commit the underlying felony, *see* Tenn. Code Ann. § 39-13-202(b),

and, consequently, any specific intent associated with the underlying felony is transferred to the homicide, *see State v. Godsey*, 60 S.W.3d 759, 773 (2001). Accordingly, voluntary intoxication is not a defense to felony murder, *see State v. Howard*, 693 S.W.2d 365, 368 (Tenn. Crim. App. 1985); *see also Butler v. State*, No. W2024-00996-CCA-R3-PC, 2025 WL 1113417, at *8 (Tenn. Crim. App. Apr. 15, 2025) (same), but evidence of intoxication is admissible to negate the mens rea required for the underlying felony when appropriate, *see Wiley v. State*, 183 S.W.3d 317, 333 (Tenn. 2006) (citing *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999)); *see also* Tenn. Code Ann. 39-11-503(a). Moreover, "[t]here must be some evidence that the intoxication deprived the accused of the mental capacity to form specific intent. The determinative question is not whether the accused was intoxicated, but what was his mental capacity at the time." *Howard*, 693 S.W.2d at 368.

Child neglect "is a nature-of-conduct offense, meaning that the offense seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the defendant's conduct achieves." *Mateyko*, 53 S.W.3d at 673 (citation omitted). Here, that conduct was Defendant's mixing alcohol and illegal drugs at a time when he knew that he would be the sole caretaker for the infant victim. Defendant knowingly elected to consume those substances and engage in that conduct while he was sober. *See Butler*, 2025 WL 1113417, at *8 ("Proof of intoxication alone is insufficient; the determinative question is the defendant's mental capacity *at the time of the offense*.") (emphasis added). The evidence established that Defendant's voluntary ingestion of drugs and alcohol resulted in his passing out on top of the victim, resulting in her death. Under these circumstances, Defendant's voluntary intoxication did not negate the applicable mental state for the charged offenses, and the trial court did not err by refusing to instruct the jury on voluntary intoxication.

## VI. Eighth Amendment

Finally, Defendant, citing *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), argues for the first time on appeal that aggravated child neglect "should not be a predicate felony for an offense, felony murder, which mandates life in prison" and asks this court "to determine if an automatic life sentence may be applied for a crime of negligence." The State asserts that Defendant waived this issue by failing to raise it in the trial court and that he cannot establish entitlement to plain error review.

We agree with the State that Defendant waived his Eighth Amendment challenge by failing to raise it below. Because he has not asked us to do so, we will not consider this claim via plain error review. *See State v. Newman*, No. E2024-00600-CCA-R3-CD, 2025 WL 1378781, at *6 (Tenn. Crim. App. May 13, 2025), *perm. app. denied* (Tenn. Sept. 11, 2025) ("The first and best way to obtain plain error review is to ask for it." (citing *Thompson*, 2023 WL 4552193, at *5)). Furthermore, we observe that we may not consider an issue of first impression using the plain error doctrine. *See State v. Lowe*, No. E2025-00140-CCA-R3-CD, 2026 WL 810567, at *14 (Tenn. Crim. App. Mar. 24, 2026) (declining

to consider issue of first impression under the plain error doctrine) (first citing *State v. Fusco*, 404 S.W.3d 504, 532, 535-36 (Tenn. Crim. App. 2012); and then *State v. Cody*, No. E2022-00947-CCA-R3-CD, 2023 WL 9006670, at *20 (Tenn. Crim. App. Dec. 28, 2023)); *see also State v. Pewitte*, No. W2024-01128-CCA-R3-CD, 2025 WL 3510902, at *5 (Tenn. Crim. App. Dec. 8, 2025) (stating that proponent cannot establish the breach of a clear and unequivocal rule of law "when the issue is one of first impression" or "when the defendant advances a novel legal theory" (citations omitted)).

## Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE